# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Joseph Riad

### DEFENDANTS
Solutions Acquisitions Logistics & Training, LLC; and Jesse Grantham, and Grantham Cope & Windsor Associates, Inc., and Pya Cope, and John Moran, and William Widnsor, and Frank DeLape, and William Karrington, and Legendary Global Partners, LLC

**(b)** County of Residence of First Listed Plaintiff   Chester County, PA
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Bernard Parish, LA
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Pro SeS

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government Plaintiff

☒ 3  Federal Question *(U.S. Government Not a Party)*

☐ 2  U.S. Government Defendant

☒ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

### CONTRACT
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

### TORTS
**PERSONAL INJURY**
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Personal Injury - Medical Malpractice

**PERSONAL INJURY**
☐ 365 Personal Injury - Product Liability
☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

### FORFEITURE/PENALTY
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 690 Other

### LABOR
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Management Relations
☐ 740 Railway Labor Act
☐ 751 Family and Medical Leave Act
☐ 790 Other Labor Litigation
☐ 791 Employee Retirement Income Security Act

### BANKRUPTCY
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

### SOCIAL SECURITY
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES
☐ 375 False Claims Act
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Sat TV
☐ 850 Securities/Commodities/ Exchange
☐ 890 Other Statutory Actions
☐ 891 Agricultural Acts
☐ 893 Environmental Matters
☐ 895 Freedom of Information Act
☐ 896 Arbitration
☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
☐ 950 Constitutionality of State Statutes

### REAL PROPERTY
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

### CIVIL RIGHTS
☐ 440 Other Civil Rights
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/ Accommodations
☐ 445 Amer. w/Disabilities Employment
☐ 446 Amer. w/Disabilities Other
☐ 448 Education

### PRISONER PETITIONS
**Habeas Corpus:**
☐ 463 Alien Detainee
☐ 510 Motions to Vacate Sentence
☐ 530 General
☐ 535 Death Penalty
**Other:**
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition
☐ 560 Civil Detainee - Conditions of Confinement

### IMMIGRATION
☐ 462 Naturalization Application
☐ 465 Other Immigration Actions

## V. ORIGIN *(Place an "X" in One Box Only)*
☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from Another District *(specify)*
☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity):*
RICO Act 18 U.S.C § 1962 (c), (d) ("Rico")
Brief description of cause:
Conversion, unjust enrichment, civil conspiracy, embezzlement

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____
DOCKET NUMBER _____

DATE   8-14-2015

SIGNATURE OF ATTORNEY OF RECORD   Joseph Riad

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM** to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff: *509 School house rd. Kennett Square, P.A 19348*

Address of Defendant: *Through out the United States*

Place of Accident, Incident or Transaction: *Pennsylvania*
(Use Reverse Side For Additional Space)

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?
(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))   Yes☐   No☒

Does this case involve multidistrict litigation possibilities?   Yes☒   No☐
*RELATED CASE, IF ANY:*
Case Number: _____   Judge _____   Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
   Yes☐   No☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
   Yes☐   No☒

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?
   Yes☐   No☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
   Yes☐   No☒

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A. *Federal Question Cases:*

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
    (Please specify) _____

B. *Diversity Jurisdiction Cases:*

1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☒ All other Diversity Cases
   (Please specify) _____

**ARBITRATION CERTIFICATION**
*(Check Appropriate Category)*

I, *Joseph E Riad*, counsel of record do hereby certify:

☐ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☐ Relief other than monetary damages is sought.

DATE: *8-14-2015*     *Joseph E. Riad*          _____
                       Attorney-at-Law    *Plaintiff*        Attorney I.D.#

**NOTE:** A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: *8-14-2015*     *Joseph E Riad*          _____
                       Attorney-at-Law                Attorney I.D.#

CIV. 609 (5/2012)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### CASE MANAGEMENT TRACK DESIGNATION FORM

|  |  |
|---|---|
| : | CIVIL ACTION |
| v.    : |  |
| : |  |
| : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

### SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.        ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
and Human Services denying plaintiff Social Security Benefits.        ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.    ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
exposure to asbestos.        ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
commonly referred to as complex and that need special or intense management by
the court. (See reverse side of this form for a detailed explanation of special
management cases.)        ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.    ( )

| 8-14-2015 | _Sign_ FR~ed_ | |
|---|---|---|
| **Date** | **Attorney-at-law** | **Attorney for** |
| 484 748 1878 | Plaintiff | Triad Triad holdings. com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

Joseph Riad, Plaintiff
509 Schoolhouse Road
Kennett Square, PA 19348
484.748.1878
jriad@riadholdings.com

## IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOSEPH E. RIAD,** <br> (Chester County, PA) | : | **DOCKET NO.:** _____ |
| Plaintiff, | : | |
| v. | : | **CIVIL COMPLAINT** |
| | : | |
| **SOLUTIONS ACQUISITIONS LOGISTICS** | : | |
| **& TRAINING, LLC,** | : | |
| (Madison County, MS) | : | |
| **and** | : | |
| **GRANTHAM, COPE, AND WINDSOR** | : | |
| **ASSOCIATES, INC.** | : | |
| (Bernard Parish, LA) | : | |
| **and** | : | |
| **JESSE GRANTHAM,** | : | |
| (Jones County, MS) | : | |
| **and** | : | |
| **PYA COPE,** | : | |
| (Cumberland County, ME) | : | |
| **and** | : | |
| **JOHN MORAN** | : | |
| (Clark County, NV) | : | |
| **and** | : | |
| **WILLIAM WINDSOR** | : | |
| (Osceola County, FL) | : | |
| and | : | |
| **FRANK DELAPE** | : | |
| (Harris County, TX) | : | |
| **and** | : | |
| **WILLIAM KARRINGTON** | : | |
| (Dallas County, TX) | : | |
| **LEGENDARY GLOBAL PARTNERS, LLC** | : | |
| (Dallas County, TX) | : | |
| | : | |
| Defendants. | : | |

1

**COMPLAINT**

Plaintiff, Joseph Riad ("Plaintiff"), hereby files this Complaint and in support thereof avers as follows:

## I.  INTRODUCTION

Plaintiff brings this action for breach of contract, a Declaratory Judgment under the *Declaratory Judgment Act, 28 U.S.C. § 2201*, conversion, unjust enrichment, misrepresentation, civil conspiracy and violations of the federal Racketeer Influenced and Corrupt Organizations RICO Act, *18 U.S.C. § 1962(c),(d)* ("RICO").

Plaintiff seeks damages, including, actual and compensatory, treble, punitive, restitutionary and interest, injunctive, declaratory and emergency relief and any and all other relief this Honorable Court deems necessary or proper.

### TABLE OF CONTENTS

| Counts | Claims | Defendant(s) | Summary of Allegations |
|--------|--------|--------------|------------------------|
| Count 1 | Breach of Contract | S.A.L.T. | Breach of the Riad-RGH-S.A.L.T. Agreement as to the UBS Gold Certificates and gold CDs (identified in detail below). |
| Count 2 | Breach of Contract | Jesse Grantham | Breach of the Safe Keeping Agreement. |
| Count 3 | Breach of Contract | Jesse Grantham and S.A.L.T. | Breach of the May 2015 Settlement Agreement. |
| Count 4 | Breach of Contract | Legendary | Breach of the December, 2014, agreement between Plaintiff and Legendary. |
| Count 5 | Declaratory Judgment | Jesse Grantham and S.A.L.T. | Declaratory Judgment. |
| Count 6 | Conversion | Jesse Grantham and Pya Cope | Conversion of the Sagittarius 2777817 Certificate and two UBS CDs. |
| Count 7 | Unjust Enrichment | Jesse Grantham, Pya Cope, GCW, John Moran and William Windsor | Unjustly enriched by virtue of actual or constructive possession and monetization or other utilization or any attempt thereof with respect to the Sagittarius 2777817 Cert. and the 2 UBS CDs. |
| Count 8 | Misrepresentation | Jesse Grantham, Pya Cope, John Moran, S.A.L.T., Legendary, Frank DeLape and William Karrington | Certain materially false representations made to Plaintiff relating to the financial, banking and political capacity of Jesse Grantham and S.A.L.T. made to induce Plaintiff to enter into business relationships with S.A.L.T., Jesse Grantham and RGH. |
| Count 9 | Misrepresentation | Jesse Grantham, Pya Cope, John Moran, S.A.L.T., Legendary, Frank DeLape and William Karrington | Certain materially false representations made to Plaintiff relating to the communications with BB&T bank made to induce Plaintiff to enter into business relationships with S.A.L.T., Jesse Grantham and RGH. |

| Count 10 | Misrepresentation | Jesse Grantham, Pya Cope, and S.A.L.T. | Certain materially false representations made to Plaintiff relating to the procurement of the bank guaranteed, SKR, issued for the benefit of RGH and Plaintiff by BB&T bank, Kentucky and the existence and contract with the US trader. Certain materially false representations made to Plaintiff relating to the placement of the 2 UBS gold CDs in the BB&T safety deposit box and the agreement with UBS, N.A. to cash same for the benefit of RGH and Plaintiff. |
|---|---|---|---|
| Count 11 | Civil Conspiracy | Jesse Grantham, Pya Cope, John Moran, William Windsor, S.A.L.T., Legendary, Frank DeLape and William Karrington | Conspiracy by the defendants as to the civil claims listed in Counts 5-13. |
| Count 12 | Racketeer Influenced and Corrupt Organizations Act, *18 U.S.C. § 1962(c)* | Jesse Grantham, Pya Cope, John Moran, William Windsor, S.A.L.T., Legendary, and Frank DeLape | The predicate acts alleged here cluster around numerous counts of mail and wire fraud, and interstate transportation of stolen property during the past ten (10) years.  See 18 U.S.C. §§ 1342, 1343, 2319, 2315 respectively.  The primary objective of the racketeering *enterprise* has been to inflict severe and sustained economic hardship upon "Persons", as the term is defined in the statute, including, without limitation, Plaintiff; with the intent of illegally depriving said Persons, including, without limitation, Plaintiff,[1] of their respective property so as to obtain financial benefit for Defendants. |
| Count 13 | Racketeer Influenced and Corrupt Organizations Act, *18 U.S.C. § 1962(d)* | Jesse Grantham, Pya Cope, John Moran, William Windsor, S.A.L.T., Legendary, and Frank DeLape | Conspiracy to violate section 1962(c) of the Racketeer Influenced and Corrupt Organizations Act. |

## I.   JURISDICTION AND VENUE

1.      In accordance with *28 U.S.C. § 1331 and 18 USC § 1964,* there is federal question jurisdiction over the claims brought pursuant to *18 USC §§ 1964(c)(d)* (RICO) because they arise under the laws of the United States.  In accordance with *28 U.S.C. § 1332*(a)(1), there is  diversity

---

[1] This Complaint details numerous facts relevant to personal jurisdiction of the defendants. However, the following are several contacts with this forum state that are not detailed sufficiently in the body of the Complaint.  Grantham on behalf of himself, Moran and S.A.L.T. came to Pennsylvania several times to meet with Plaintiff from September 2014 through April 2015.  A final trip was scheduled for April 27, 2015; however, Grantham represented that he was unable to make same due to a heart attack.  Moran was aware of and facilitated some or all of these trips as he paid for Grantham's traveling expenses. Cope came to Pennsylvania on at least one occasion on or about the first week of October, 2014, to discuss the contemplated joint venture, Plaintiff's concerns as to Grantham, S.A.L.T. and others, her political contacts and confirmations as to the legitimacy of the contemplated transaction through said contacts and the Mexican Airport Project. The sole bank account of RGH (given that the security account was in fact never opened on behalf of RGH at BB&T Kentucky) was opened, at Grantham and S.A.L.T.'s request on or about 1/21/2015 at Bank of America, Kennett Square, PA (Chester County, PA).  Grantham than spoke with Mark Walsh, several other Kennett Square, BOA, officers and Mr. Bassam (regional President of BOA) in or around March of 2014, wherein he stated that RGH had a wire coming in for between 1 to 2 billion (from Goldman Sachs) and already had bank guaranteed SKRs for the Sagittarius 277817 Cert at BB&T Bank.  All or almost all of the call's participants were located in PA at the time of the call.

jurisdiction over the state law claims and the claim for Declaratory Judgment, under *28 U.S.C. § 2201*, because the amount in controversy exceeds $75,000.00 and there is complete diversity of citizenship.  In accordance with *28 U.S.C. § 1367*, there is supplemental jurisdiction over the state law claims and the claim for Declaratory Judgment, under *28 U.S.C. § 2201*, because they arise from the same nucleus of operative facts.

2.      The defendants contacts with this state of Pennsylvania satisfy the standards for "minimal contacts" set forth in accordance with *International Shoe Co. v. Washington,* 326 U.S. 310 (1945) and its progeny.  Defendants S.A.L.T., RGH, Jesse Grantham and John Moran consented to jurisdiction in Pennsylvania under the terms of the relevant contract(s)[2].  Additionally or alternatively, this Court, in accordance with *18 USC § 1965(b)*, may properly maintain personal jurisdiction over all defendants as it can properly maintain jurisdiction over at least one (1) defendant and (2) the "ends of justice require".[3]

3.      Venue is properly laid in this Court in accordance with *28 U.S.C. §§ 1391(b)(2), 1391(bis)(3)*, because (1) a substantial amount of events occurred within this judicial district and effected property within this judicial district and, (2) at least one defendant is subject to personal jurisdiction within this judicial district and there is no other appropriate venue for this matter to be heard.  Additionally or alternatively, venue is properly laid in this Court because (1) Defendants consented to venue within this judicial district; namely, Philadelphia County; and, (2) in accordance with *18 USC § 1965(b)*, (a) this Court can properly maintain jurisdiction over at least one defendant and (b) the "ends of justice require".[4]

## III.   PARTIES

1.      Plaintiff, Joseph Riad ("Plaintiff"), is an adult individual who has at all relevant times resided in Chester County, PA.  Plaintiff is the President of Defendant RGH and has a sixty percent (60%) ownership interest in same. *See, App. 1, p. 1 (Demonstrative Chart of Business Hierarchies and Relationships); see also, App. 2, (Membership Certificate, Joseph Riad).*

2.      Defendant, Solutions Acquisitions Logistics & Training, LLC ("S.A.L.T.") (business ID No. 1004957) was formed in the state of Mississippi on July 12, 2012.  S.A.L.T. has an address of 441 NorthPark Dr. Ridgeland, Mississippi 39157.  S.A.L.T. has a forty percent (40%) ownership interest in Defendant RGH. *See, App. 1A.*  S.A.L.T. is in the business of domestic and international security and defense training.[5]

3.      Defendant, Grantham, Cope, and Windsor Associates, Inc. (**"GCW"**) (charter no.: 41897124D) was incorporated in the State of Louisiana on May 27, 2015.  GCW has an address of 8320 Lafitte Court, Chalmette, LA, 70043. *See, App. 1C.*

4.      Defendant, Jesse Grantham (**"Grantham"**), is an adult individual approximately 41 years of age.  He currently resides at 1008 East Magnolia Street Ellisville, MS 39347.  Grantham holds himself out as a billionaire who has made his money through access to trading platforms.

---

[2] Including, without limitation, *RGH-S.A.L.T.-Riad Agreement ("Certs. Agrmt.")* ¶ 10.2.
[3] The "ends of justice require" where, as here, jurisdiction in Pennsylvania is the only way in which the "plaintiffs [can] bring all members of a nationwide conspiracy before a court in a single trial."
[4] Fn4 is restated here in relation to venue within this judicial district.
[5]

Grantham is the President of S.A.L.T. and GCW.  Grantham is the agent of Defendants S.A.L.T., GCW and RGH as follows:  Grantham is the Secretary of RGH.  Grantham has a fifty percent membership interest in S.A.L.T., a forty percent membership interest in RGH; and upon information and belief at least a thirty-three percent membership interest in GCW.

6.      Defendant Pya Cope (**"Cope"**) is an adult individual, who is in or around sixty-two years of age.  Upon information and well-founded belief, she resides at 66 Pya Road, Portland, ME, 04103.[6]  Cope is the daughter of deceased senator, Mitchel Cope; she is a political lobbyist in Washington, D.C., works as a consultant for the U.S. F.D.I.C. and is in the business of securing project funding. She has represented on multiple occasions that she has political connections to President Obama, Hillary Clinton, former U.S. diplomat(s) and current U.S. State Department officials. *See, App. 3A/B, Texts 8/24/14, 8/27/14.*  Cope is the agent of Defendant GCW as she has a membership interest in same and is the Executive VP.

7.      Defendant John Moran (**"Moran"**) is an adult individual currently resides at 598 Foster Springs Road, Las Vegas, NV 89148. Moran is the CFO of S.A.LT. Moran holds himself out as a high net-worth individual who and has made his money through banking and oil transactions. Moran is an agent of S.A.L.T. as he is its CFO and has a fifty percent membership interest.

8.      Defendant William Windsor (**"Windsor"**) is an adult individual currently resides at 2432 Bel Air Cir., Kissimmee, FL, 34743. Windsor is an agent of GCW as he is a member and is its VP. Windsor holds himself out as an expert in asset management and project funding, with a concentration on funding in South American markets.  Windsor has no formal education in banking, asset management or project funding.  According to information and belief, Windsor is in fact a career criminal with a slew of convictions and pleas for embezzlement, theft, banking fraud and organized crime (RICO) type offenses.  Windsor's relationship to Cope, Grantham, Moran and S.A.L.T. was concealed said defendants from Plaintiff.

9.      Defendant Frank DeLape ("DeLape") is an adult individual who currently resides at 401 Lakeshore Drive, Seabrook, TX, 77586.  DeLape is a principal and authorized representative of Defendant Legendary and holds a membership interest in same.  DeLape is the CEO of a non-party to this action, Benchmark Capital and Blackstone Worldwide Partners.  DeLape is a well-known socialite in Houston, Texas.  It is well documented in online articles that DeLape and his wife, Kimberly DeLape run in circles with the Bush family and other high-profile and participate in numerous humanitarian and charitable events, including dressing up as Santa and visiting orphanages at Christmas time.

10.      Defendant William Karrington ("**Karrington**") is an adult individual who currently resides at 3500 Granada Avenue, Dallas, TX, 75205.   Karrington is a principal and authorized representative of Defendant Legendary.

11.      Defendant, Legendary Global Partners, LLC ("**Legendary**"), was formed in the state of Texas on [date].  It has a registered address is 3500 Granada, University Park, Texas 73205; its registered agent is [name]. At all relevant times Frank DeLape ("DeLape"), William Karrington

---

[6] Cope has also maintained a condo in Washington D.C. and a second home (her marital residence prior to her semi-recent divorce) 9535 East Aspen Hill Place, Lone Tree/Littleton, CO..

("Karrington") and Isaac Addo ("Addo") acted in their capacity as authorized representatives, members and/or officers. *See, App. 1B.*

## RELEVANT NON PARTIES

12.     Riad and Grantham Holdings, LLC ("**RGH**"),[7] was formed in the State of Delaware on August 27, 2014 and has a registered address of 886 Sharpless Road, Hockessin Delaware.  RGH is the joint venture company formed pursuant to the JVA between Plaintiff and S.A.L.T. dated 8/27/14, as amended and restated on 10/6/2014 and 10/27/14respectively.[8]


## III.     FACTUAL ALLEGATIONS
### Background

13.     Plaintiff is the owner of certain authenticated assets, including, UBS gold certificates, referred to in this Complaint as "Sagittarius 2777817 Cert.", "Sagittarius 2777818 Cert." or "Capricorn 27778126 Cert."; and, two gold certificates of deposit ("UBS CDs").  The UBS gold certificates each represent a quantity of 3,500 metric tons of gold deposited in UBS, Switzerland. The UBS CDs have the stated face value on each CD and bear interest at a rate of 7% per annum until the maturity date.  (collectively referred to as "UBS assets").  *See, App. 4, photograph of UBS Gold Certificates and CDs, sent by Grantham on 7/24/2015.*

14.     Grantham took possession of the UBS assets from Plaintiff, under false pretenses, and as of the date of the filing of this Complaint has refused to return same to Plaintiff.

15.     The purpose of the RGH joint venture was to utilize certain assets owned by Plaintiff to stabilize the US economy; and, pursuant to same, S.A.L.T. would take any and all legal actions to facilitate the monetization, including acting as a liaison with the U.S. government and paying all costs prior to monetization.  Unless and only to the extent otherwise agreed in writing, Plaintiff owned the assets and no other person or entity, including S.A.L.T. and RGH, had any interest in or to any asset.

16.     In relation to any and all contemplated monetizations, it was the exclusive obligation of S.A.L.T. to monetize the assets and finance same and, depending upon the assets it was either the decision of RGH to accept a monetization offer or the exclusive decision of Plaintiff.

17.     Both parties had the right (but not the obligation) to terminate the JVA and the JVA company, RGH, if S.A.L.T. failed to monetize a minimum number of assets by the Drop Dead Date of December 26, 2014.

18.     RGH was initially formed based on the false representation by Grantham, Moran, Cope and DeLape that Grantham and S.A.L.T. could monetize a separate group of financial assets; on

---

[7] RGH is not a named defendant at this time because it is believed that Grantham and Cope have and have always had physical possession of the Sagittarius 2777817 Cert. and 2 gold CDs; and, have never placed any of said assets in the physical or legal possession of RGH.  In the event RGH has or has ever had physical or legal possession of any of the assets at any material time, Plaintiff reserves the right to amend the Complaint and bring any claim against RGH at such time.

[8] Plaintiff and all or most defendants have copies of same; however, the agreement is approximately 120 pages and is only tangentially relevant to the claims.  It is therefore not annexed as an Appendix.

December 18, 2014[9], Grantham represented that the closing date was set for January 22, 2015 (and this monetization was allegedly completed and simply on hold for payment), based on the belief that the initial transaction was completed and the false statements stated in detail below, Plaintiff was induced into entering into a second transaction with RGH and S.A.L.T. for the monetization of the UBS assets.

## STATEMENTS RELATING TO FINANCIAL, BANKING AND POLITICAL CAPACITY

19.     The defendants to this action (excepting GWC which was not formed at this time), falsely represented that Defendants Grantham and S.A.L.T. had substantial financial capacity; namely a bank account at Wells Fargo, NA, holding in or around $14 billion dollars. That the origin of same was legitimate; and, Grantham had made the funds over a period of three (3) years during which time he was given access to one of the top traders and trading platforms in the US through an introduction made by certain high-valued political connections after Grantham's military service had ended.  Each specific incident wherein same was stated are too numerous to mention; however, a summary of the statements made is produced below:

20.     On or about August 10, 2014, Plaintiff was introduced to Grantham and Addo by Robert Albi ("Albi") by way of an initial Skype conference call that included Riad, Grantham, Addo and Albi.

21.     On said call, Grantham represented that he, by and through his company, S.A.L.T., he further represented that he had funds in or around $14 billion USD at Wells Fargo.  That the origin of same was legitimate; and, Grantham had made the funds over a period of three (3) years during which time he was given access to one of the top five traders and trading platforms in the US through an introduction made by certain high-valued political connections after Grantham's military service had ended.

22     On or about August 10, 2014, Grantham and Cope met Plaintiff and my counsel in Washington DC.  Grantham and Cope represented on numerous occasions, beginning at this meeting, that Grantham, by and through S.A.L.T. had engaged in and successfully completed, domestic and international banking and commodities transactions (namely oil) beginning in late 2013 or early 2014.  Grantham represented further that he had an ongoing working relationship with the U.S. Treasury department and he has just finished a meeting with them laying out the groundwork to fund and repatriate bonds owned by me.

23.     Grantham, on numerous occasions, including at this meeting explained that S.A.L.T. began by holding training seminars for local law enforcement agencies and then expanded this internationally.  With respect to its alleged international training, Grantham represented that he and his partners provided training seminars for military in other countries where a "watered-down" version of U.S. training was provided.  It was through this international training that Grantham and S.A.L.T. had developed strong rapport with the DOD as the curriculum, which included certain U.S. military training and intelligence, had to be "ok-ed" by the DOD.

---

[9] December 18, 2015, through January 21, 2015, Defendant Grantham and S.A.L.T. continued to represent in text messages, emails and in person conversations that this was completed and they had an appointment at the Federal Reserve, Atlanta George ("Fed Window") on January 22, 2015.

24.     Cope, who accompanied Grantham to the above referenced meeting, represented herself as an FDIC consultant and expert in currency authentication.  At this meeting, Cope performed a visual authenticity test and confirmed validity of the bonds and told Grantham she will verify to his Treasury contacts that she indeed verified the bonds' validity and to move forward with the contract for redemption.

25.     Jesse C. Grantham also confirmed Cope's statement during the meeting that she had similar training in document authentication as the US secret service during her time she was working for the FDIC. He said the reason he chose to partner up with Cope, was because of her vast knowledge and her political contacts because of her father, as Cope confirmed she practically grew up as a child playing in the white house, and has constant contact with the US secret service. Prior to the meeting, I furnished all the information and file on my bonds to Jesse C Grantham, who shared it with his junior partner Cope. The meeting was set after Grantham and Cope did their own due diligence on the bonds, and asked me to come and meet them with 5 of the bonds, to do their own visual exam, similar to the exam that any secret service agent would do, to determine validity. I complied and agreed to the meeting after Jesse told me he submitted my file to the US. Department of Treasury and they confirmed to him that they were well aware of me, and my file, and wanted to work out a deal whereby they can redeem these bonds and put a restriction on the funds to be spent in the US economy.   They would also redeem a certain amount of bonds, yearly starting with 5 bonds at face value, which is 1 billion US dollars per bond.

26.     At this meeting Grantham introduced Cope, and Cope confirmed, that she was the junior partner of Grantham's and brought substantial value to the contemplated business relationship between Plaintiff and S.A.L.T. as she had extensive knowledge of banking laws and had political contacts that can confirm any statements he was making to Plaintiff.

27.     At the close of this meeting, Grantham represented that he had to attend a meeting with a U.S. general; he asked me to take Cope and my counsel out to dinner to continue the discussions as to the contemplated business relationship between S.A.L.T. and myself.  I quickly grew to trust Cope; she was the daughter of an esteemed senator, Mitchell Cope; and, who had substantial DC connections in her own right.

28.     From 8/10/14 through 5/12/15, Grantham, Moran, Cope and DeLape falsely represented that Grantham and S.A.L.T. were working with or in consultation with certain individuals, including Haley Barbour and Alan Greenspan; and further that he routinely played golf with Mr. Barbour and Mr. Bush.  Grantham does not have political contacts and he does not work with or in consultation with such persons as Haley Barbour or Alan Greenspan.

29.     Shortly after the meeting, and prior to executing the above referenced JVA, Plaintiff requested she use her contacts to confirm Grantham's statements.  Cope represented on or about August 24, 2014, that she was in fact speaking with her contact at the State Department.  Cope represented that they were walking through DC so as to keep the communications confidential, walking in and out of a museum and other areas of DC. Cope represented that she had her State Department contact confirm Grantham's statements with his US Treasury contacts.  She then contacted Plaintiff after her meeting and confirmed Grantham's representations with the Office of the Treasury.

8

30.     On August 24, 2014, Cope sent Plaintiff a text message representing that she could facilitated a meeting with President Obama; and, on August 27, 2014, Cope sent Plaintiff a text message representing that she had connections with a certain former US diplomat that was interested in meeting with Plaintiff to discuss the issue as well. *See, App. 3, 8/24/14 & 8/27/14 texts.*

31.     In or around late September or early October of 2014[10], Cope drove to Pennsylvania and met with Plaintiff and my counsel at my residence in Nottingham, PA to discuss my growing concerns regarding Grantham, Moran and S.A.L.T.  Cope also suggested to set up a meeting with her contact in the Obama administration.  Cope was working on two projects as a lobbyist.  One was building an airport in Mexico, and she claimed that she was in direct contact with the president of Mexico, and the Clintons were involved in that project, and another project was a battered woman's facility (allegedly the President's "right-hand man's" wife ran this facility).  Cope asked if I can donate money or pledge one of my bonds as collateral for funding these projects, and she promised me that if I did that, President Obama will personally oversee a smooth transaction with redeeming my bonds. I told Cope that according to the agreement that I had with Jesse C Grantham, I was supposed to spend my funds domestically in the United States, and that I had no interest in investing in other countries.  Cope tried convincing me that it's best to diversify, and that her contact at the State Department can clear this exception to invest in Mexico.  She also asked me if I can donate my farm on 223 green house road, Nottingham PA, to the battered woman's shelter, and that would create a good name for me with the Obama administration as this project is important to first lady Michelle Obama, who her best friend is personally in charge of raising funds for this project.  I told her that I am currently in the process of evicting the tenants on this property for not paying me any money to live there and that I will gladly take that into consideration, as I do support humanitarian projects and being part of a solution to help people that need help in my country.

32.     Again, Cope stated that she believed in Grantham and had verified him through her contacts in D.C.; however, she offered to introduce me to her rolodex of contacts, including the Clintons and Obama, in the event that Grantham failed to perform.  She stated that she did not want to circumvent Grantham and Plaintiff would have to follow through with Grantham and S.A.L.T.; and only in the event of non-performance would she step in.

33.     On or about October 4, 2014, Plaintiff contacted Mr. Don Robert Albi and Mr. Issac Addo regarding his concerns that Grantham and S.A.L.T. could not complete the initial business transaction.  I explained that my concerns stemmed from Grantham's lack of responses, failure to have his attorney Kim Johnson, Esq., respond to my counsel, Grantham's failure to produce the POF and banking invitation letters.  I clearly and unequivocally stated my intention to cancel the business relationships with Grantham and S.A.L.T.

34.     Mr. Addo suggested that while I had valid concerns, I should speak with Mr. Frank DeLape ("DeLape") who knew Grantham and S.A.L.T. better than Mr. Addo.  Mr. Addo explained that DeLape had closed transactions with S.A.L.T. in the past and had personal knowledge as to Grantham and S.A.L.T.'s financial, political and banking capacity.  Mr Delape is the one that introduced Jesse C Grantham to Mr Addo.   He told him the same thing he told me that he

---

[10] Prior to the 10/4/14 conference call.

completed many transactions with him, yet Mr. Addo had concerns of his own because he seemed to encounter the same challenges with Jesse C Grantham as I was encountering.

35.     I agreed to speak with DeLape and Mr. Addo added DeLape to the Skype call. I introduced myself to DeLape and restated my concerns to him. I explained that I had serious doubts as to whether or not Grantham and S.A.L.T. had any money as they had not produced the POFs or any documentary showing their banking and political relationships. I repeatedly requested to speak to Kim Johnson, Esq., who was supposedly Grantham and S.A.L.T.'s counsel and I was told she was traveling overseas in Dubai on an oil transaction for Grantham.

36.     On this call, DeLape represented that he had personally seen the bank account holding the $14 billion dollars. He further explained that the origin of same was legitimate; and, Grantham had made the funds over a period of three (3) years during which time he was given access to one of the top trading platforms in the US through an introduction made by certain high-valued political connections after Grantham's military service had ended.[11]

37.     DeLape explained that Grantham was under significant emotional stress due to his divorce and custody battle with his [soon-to-be] ex-wife; and, was trying to shield his and S.A.L.T.'s assets from this divorce battle.

38.     Grantham's personal issues DeLape explained, was the reason that Grantham and therefore S.A.L.T. often were unable to return phone calls in a timely fashion and adhere to schedules.

39.     I asked DeLape if he had ever closed a transaction with Grantham and S.A.L.T. in the past of this magnitude. DeLape reiterated that he had worked on transactions with Grantham and S.A.L.T. in the past, some of which had closed and some which had not closed. DeLape assured Plaintiff that based on this past experience with Grantham, if Grantham couldn't perform, he would "man-up" and tell Plaintiff. Since Grantham, on behalf of himself and S.A.L.T., was continuously representing that he was certain he could complete the transaction, Plaintiff had nothing to worry about.

40     DeLape set up the conference call between Plaintiff, Grantham, Cope, Albi, himself and Plaintiff's counsel which was held on October 6, 2014, at 12:30 EST (call in n.: 661-673-8600, access, 270440).

41.     During numerous calls between Plaintiff and Grantham from December, 2014, through May, 2015, Grantham represented that he and S.A.L.T. had the financial capacity to finance the contemplated transactions. Same was stated in both the 1/15/2015 and 2/5/2015[12] Certs. Agrmt. as the contribution of S.A.L.T. in the context of the transaction contemplated thereby.

---

[11] Mr. Addo communicated this representation to Plaintiff and Robert Albi on the initial conference call introducing Plaintiff to Defendant Grantham as DeLape had initially represented the statements regarding Grantham and S.A.L.T. to Mr. Addo in or around 2013. Same is confirmed in an email to my counsel wherein my attorney sent Grantham and Mr. Addo a Mandate Letter and Mr. Addo responded with the clarification that Grantham and not himself was the account signatory.

[12] The agreement was dated the 2nd but was executed the 5th of February.

42.     In or around late November 2014, during a conversation between Plaintiff, DeLape and Karrington, Plaintiff mentioned that he had a second group of assets (the UBS assets) and that he would be interested in monetizing them after the initial group of assets were successfully monetized.

43.     DeLape and Karrington represented that they would be interested in assisting Plaintiff to monetize the UBS assets while Grantham was finishing up with the initial transaction.

44.     DeLape represented that he would need about a week to confirm the authenticity of the UBS assets with his own contacts with the US Treasury.  Plaintiff and my counsel agreed to same.

45.     In or around a week later, DeLape and Karrington represented to Plaintiff and my counsel that their contact (a senior Treasury official) had confirmed that the UBS assets were authentic. The basis of his confirmation, in addition to doing due diligence, was that the same "zodiac" assets (different certificates obviously) had been monetized during the Reagan administration.

46.     Accordingly, Plaintiff and Legendary, by and through DeLape and Karrington, came to the following agreement regarding monetization of the UBS assets:  Legendary would receive 30% of the monetization proceeds for any UBS asset monetized through their contacts; and, Legendary would conduct full due-diligence on the monetization sources and opportunities, including, confirming that all relevant entities were financial capable and reliable.

47.     Between the months of December, 2014, through early February, 2014, numerous Grantham, Moran, Cope and S.A.L.T. falsely represented to me that Grantham had an account with BB & T Bank, Kentucky; and Grantham's top trader had a credit line with said bank in an amount over $10 billion; and that Plaintiff's assets placed in safe keeping with Grantham would be and were placed in safe keeping with BB & T, Kentucky 401 W. Main St., Louisville, Kentucky. *See, App. 5 (SKR), App. 6 (Written Consent).*

48.     On or about 12/16/14 DeLape and Karrington represented that they had a potential deal: After contacting multiple US banks, they had found a bank (BB&T) that would be willing to permit a trader with a credit line at the bank to utilize the credit line to fund the collateralization of a UBS Gold Certificate.

49.     They further explained that the trader had agreed to take the UBS asset as collateral, provided twenty percent (20%) or approximately $1 billion dollars was collateralized by cash.

50.     DeLape and Karrington further represented that they had found a source willing to provide the cash portion of the collateral, Grantham.

51.     In consideration for utilizing the UBS asset in this joint-collateralization, Plaintiff would receive a payment of $1 billion monthly; and, Quantum (and Legendary through Quantum) would receive the remainder of the trade profits generated (anticipated to be higher on average than the $1 billion).

52.     In or about December, 2015, Cope represented that Grantham was competent to handle the UBS transaction.

53.     Cope represented to Plaintiff in or around December 2014 on a telephone call between Plaintiff and Cope that Grantham was the one with the US Treasury contacts and she had seen some type of identification showing that Grantham was working with the US Treasury their agents to redeem high denomination assets.

54.     During the December 2014 call with Cope, I also asked her if she knew about Grantham and S.A.L.T.'s top trader as she had extensive knowledge about banking due to her consulting work with the FDIC.   She confirmed to me that banks did in fact have these type of wealth management or trading platforms for their high-net worth individuals.   She explained further that the traders would produce high-yield profits with little risk to the initial investment funds by through numerous different activities, including buying and selling MTNs, SBLCs and BGs (depending on the relative laws of the jurisdiction-i.e. the couldn't use BGs in the US but could buy and sell them in the UK and conversely, SBLCs were bought and sold in the US).   I asked her if she knew Grantham and S.A.L.T.'s trader and she represented that she did in fact know him and that she met him in NYC with Grantham in the past year.

55.     Since Grantham was the funding source, I discussed the contract with Grantham in or around 12/18/15.

56.     Grantham represented that Quantum and Legendary would be making substantially more than the 30% and moving forward, they should put any assets through RGH and pay the 30% commission to Legendary as agreed for putting the deal together and doing the due diligence on the assets and the bank and for the initial referral between Plaintiff and S.A.L.T.   In late December, 2014, DeLape and Karrington agreed to this regarding all UBS assets excepting the Capricorn 27778126 certificate which was to be monetized through Quantum.

57.     In or around late December, 2014, Grantham represented hat he had provided a written authenticity report from Treasury to his trader; and, his trader was willing to commit to the transaction based on same.

58.     On or about 12/18/14, Grantham confirmed that the initial transaction was "set in stone" and they had a closing date scheduled for January 22, 2015 in Atlanta, Georgia.   Therefore, they could focus their full attention on closing the UBS transaction.

59.     On or about 12/30/2014, Grantham and DeLape met to discuss and finalize the UBS asset transaction at a restaurant near Grantham's Mississippi residence.   Grantham represented to Plaintiff in a text message that day that the bank (i.e. BB&T) was finalizing the paperwork for the contemplated transaction.

60.     On or about 1/5/2015, Grantham represented in a text message to Plaintiff that he had confirmed with his banker at UBS that UBS would cash the CDs for 100% of face value.

**ENTRUSTED TO GRANTHAM AT PHILADELPHIA AIRPORT ON JANUARY 15, 2015**
61.     In or around early January, 2015, Grantham represented that he would need to take possession of the above assets as well as the UBS Gold Cert for Quantum (Capricorn 27778126

Cert.).  Grantham represented he needed to take the UBS assets to BB&T Kentucky where his trader had the credit line, *See, App. 5 (SKR), App. 6 (Written Consent).*

62.     Grantham stated that he would fly to Philadelphia, take possession of the assets; and, then take a train to D.C. (where he would stop for a meeting related to the separate monetization coming up on the 22nd of January).  The next morning he would travel to D.C. to finalize details relating to the initial monetization of the separate assets and then to Kentucky where he would place the gold certificates on deposit with BB&T bank, who would issue a safekeeping receipt with full banking responsibility for the Sagittarius 2777817 Cert. in favor of RGH and Plaintiff and a second SKR for the Capricorn 27778126 Cert. in favor of Quantum and Plaintiff. *See, App. 5 (SKR), App. 6 (Written Consent).*

63.     Grantham represented that within thirty days thereafter the trader would trade the credit line funds and the trade would begin to generate profits and Plaintiff, RGH and Quantum would receive their first tranche under the respective agreements. *See, App. 5 (SKR), App. 6 (Written Consent).*  Grantham repeated these representations during his meetings with Plaintiff and his counsel on 1/15/2015 and 1/16/2015 before Plaintiff entrusted Grantham with the assets on 1/16/2015.

64.     Grantham further represented that he would place the two UBS CDs in a safety deposit box in the name of RGH at BB&T bank, Kentucky, while he was there.  He would leave said assets in the safety deposit box until UBS was finished with the paperwork to cash them. *See, App. 5 (SKR), App. 6 (Written Consent).*

65.     Grantham, on or about 1/16/15, induced Plaintiff into relinquishing possession of the UBS assets, namely, Sagittarius 2777817 Cert. and the 2 gold CDs when he promised to hold them in personal safekeeping, *See, App. 5 (SKR),* and thereafter deposit same into safekeeping at BB & T Bank, 401 W. Main Street, Louisville, Kentucky, *See, App. 5 (SKR); see also, App. 6, ¶ 1.2 (Written Consent); Cert. Agrmt. ¶ ¶¶ 9.1,9.2, 9.5.*

66.     Plaintiff entrusted Grantham with the safekeeping of these assets at the Philadelphia Airport, located at or around 8000 Essington Ave., Philadelphia, PA on or about January 16, 2015. *See, App. 5 (SKR).*

67.     At the time Plaintiff entrusted Grantham with same, he had come to trust Grantham based on representations made over the course of a six month business relationship between the two and confirmations as to those representations from numerous individuals, including Frank DeLape, Pya Cope, William Karrington, and John Moran .[13]

68.     Pursuant to the terms of the *Cert. Agrmt. ¶¶ 9.1,9.2, 9.5.* and the SKR Agreement, *see, App. 5 (SKR),* Grantham was required to return said assets to Plaintiff by January 30, 2015, if the assets were not placed in safekeeping with BB&T by said date; and, by February 15, 2015, if the

---

[13] To be clear, each cited individual did not necessarily confirm each and every representation made by Mr. Grantham, but instead confirmed pieces of the representations; together said confirmations confirmed substantially all of the material aspects of Mr. Grantham's statements to Plaintiff.

assets had not been monetized by such date.  This date was extended to March 5, 2015, by agreement.

69.     From on or about 1/19/15, through 5/12/15, Grantham continuously made false representations to Plaintiff, Plaintiff's counsel, DeLape, Karrington and Mr. Albi (non-party) as well as bank officials at Bank of America, Kennett Square, PA branch, that said assets were in safekeeping at BB&T Bank, 401 W. Main Street, Louisville, Kentucky. *On 7/5/14 Grantham sent a text* stating in pertinent part that the assets in question were in his personal possession and he refused to return same; *see also, App. 3 7/24/15 picture text* (showing the assets in question on the lawn and not in the bank).

70.     On or about January 22, 2015, Grantham sent Plaintiff (via facsimile) banking forms from UBS bank, wherein it stated there was a deposit on behalf of RGH; and, listed a liquid asset amount of $500 million.  Grantham represented to Plaintiff that same was the account information for the UBS bank where the two CDs were to be cashed and the bank, after conducting full due diligence, had agreed to take them at 100% of face plus the 7% annual interest on each which they had calculated to be $500 million dollars.

71.     During dinner on or about 2/5/2015 with Plaintiff, Moran, Grantham and my counsel, Moran and Grantham represented that they had had a meeting with the Speaker of the House, John Boehner, as well as several members of the Senate Finance Committee at Longworth House office Building 9 Independence Ave., Suite 1232, Washington, D.C. at 4:00 p.m. on or about 2/5/15. Moran and Grantham met with Plaintiff and my counsel at 4:20 and represented the meeting was over, the deal was done and Moran then went on to describe in detail the history of the UBS Gold Certs to Plaintiff and confirmed that Grantham and S.A.L.T. had the financial and political capacity to perform under both the JVA and the Certs. Agrmt.  Moran did not inform Plaintiff until early May of 2015 that he in fact was financing all of Grantham's trips throughout the US because Grantham had no financial capacity.

72.     Thereafter, the amended Gold Certs. Agrmt. Was executed.

73.     When the assets were not monetized as stated in the contracts, Grantham continued to stall for time and represent to Plaintiff that the monetization was simply taking longer than expected.

74.     Grantham represented shortly after the 2/5/15 meeting that the US government had decided that they wanted the UBS assets to stabilize the US economy.

75.     After the second deadline of 3/2/15 had come and gone and none of the assets had been monetized as promised; Plaintiff began to request Grantham return the UBS assets so that he could utilize them while the government was working on the alleged contract.

76.     Plaintiff explained that there were 2 potential opportunities in the UK that would simply take the assets on loan/lease and allow Plaintiff to generate profits during the time the government was finalizing everything with the budget committee for the proposed offer.

77.     Grantham does not have political contacts and he does not work with or in consultation with such persons as Haley Barbour, Alan Greenspan and George Bush (Sr. and Jr.)

14

78.     On or about early May, 2015, Plaintiff was able to contact Haley Barbour.  I called the office of Mr. Barbour and left a message with his secretary.  Mr. Barbour returned my call on his cell phone after looking up my pedigree and advised me that he had no knowledge of any Jesse C. Grantham or S.A.L.T.  He told me he certainly did not know him personally or play golf with him; he further stated he would check with his office and see if there was any record of any person at his office working in any capacity with this Mr. Grantham and/or S.A.L.T. and call me back with the information.

79.     Shortly thereafter Mr. Haley Barbour called me back and told me that after speaking with his office, there was a Jesse Grantham that called his office in the recent preceding weeks.  Mr. Barbour explained that he never called him back because after doing due diligence on him, he had concluded that Grantham was a small time fraudster and goes around his local communicates promising funding to projects and failing to deliver.  He advised me he wanted no association with Grantham and therefore never bothered to return any of his calls.  He further told me he would ask Mr. David Aughenhauser, Esq. to call me to assist with this matter.  Attorney Aughenhauser did contact me the following week.

80.     On or about the first week of May, 2015 Plaintiff and Grantham came to an agreement that Grantham would return the assets:

81.     Notwithstanding numerous promises to return the assets in question; and, a settlement to do same, *and confirmations by Grantham and S.A.LT.'s former counsel as to same,* Grantham has continuously refused through his words and acts to return the assets to Plaintiff's possession.

**The Mexican Airport Project**[14]
82.     Promotora Aeroportuaria Lagos de Moreno, S.A.P.I. de C.V. ("PALM") is the purported owner of what this Complaint terms "the Mexican Airport Project".  PALM was created in 2012 for the purpose stated in Paragraph 4; and it has two (2) shareholders, the Municipality of Lagos de Moreno, Jalisco ("Municipality") owning 51% of the capital stock and Desarrolladora Aeroportuaria de Los Altos, S.A. de C.V. ("DALA")[15] in 49% of the capital stock.

83.     From 1990 until current, there has been a relatively small civil airport located upon a 34 hectare surface within the Municipality.[16]  The Municipality held an assignable permit (number ST-1198), through which it was authorized, among other things, to administrate, operate and exploit, and in its case build a private service and third party civil airport.

84.     DALA is a Mexican company that has experience in the administration, operation and exploitation of airports.

---

[14] The following paragraphs explaining the Mexican Airport are based on the factual statements provided by PALM and/or DALA in its Project Memorandums provided to potential investors by said entities' counsel, José Fernando Moreno Corona Abogado, Esquire.
[15] DALA is located in López Cotilla 858, Colonia San Antonio, in Guadalajara, Jalisco, Mexico.

[16] Said airport has the following facilities: 2,084 meter long runway; 2 position platform for small aircrafts with an approximate surface of 6,000 square meters; a 300 square meter terminal building; control tower; parking for 25 vehicles; access street from the highway and water tank.

85.     PALM was therefore created by its shareholders, the Municipality and DALA as a joint venture company; the Municipality providing the legal rights of the land upon which the airport was located and DALA providing project management service.

86.     The Mexican Airport Project's objective is to transform the small civil airport into an international cargo airport.  The completed airport is intended to be a public service civil airport, with the appropriate facilities and services for the reception and sending of aircrafts, passengers, cargo and regular air mail, as well as private commercial transport and private non-commercial transport.

87.     To make such transformation, the Mexican Airport Project intends to perform the following: (a) Enlargement of the current runway to 3,200 meters long and 45 meters wide; (b) Construction of a new runway, 4,000 meters long and 60 meters wide; (c) Construction of 3 Taxiways 2,200 meters long and 23 meters wide; (d) Construction of 3 Taxiways 4,000 meters long and 23 meters wide; (e) Construction of 134,000 square meters of 14 position platforms; (f) Construction of 10,500 square meters of bonded warehouses and storage; (g) Construction of 6,500 square meters of terminal building; (h) Construction of 12,500 square meters of parking; (i) Construction of 726 square meters of control tower; (j) Territorial reserve up to 2,500 square meters for hotel area; (k) Construction of 4,000 square meters of service station; (l) Construction of 4 fuel tanks with a capacity of 50,000 barrels; (m) Construction of 6 fuel tanks with a capacity of 30,000 barrels; and, (n) Installation of VOR (VHF Omnidirectional Radio Range) / DME (Distance Measuring Equipment) approach lamp for landing.

88.     In addition to the materials, engineers and contractors, the project will also require funds for (a) the acquisition of nearby properties, (b) retention of financial consultants and attorneys, (c) procurement of fuel Entities and experts to plan the project and provide financial consulting.

89.     Since 2012 to present PALM and/or DALA has been tirelessly seeking a Project Funder. PALM's initial share capital was in or around fifty thousand dollars ($50,000.00), yet the anticipated cost of the Mexican Airport Project is in or around two hundred and fifty million dollars ($250,000,000.00 USD).

90.     PALM sought project funding of a quarter of a billion dollars by offering an approximate twenty-five percent equity participation:  Essentially, the investing entity would provide two hundred and fifty million dollars in exchange for a 49% capital share in DALA (which in turn itself had a 49% capital share in PALM).

91.     According to DALA's own break down, the project funder would be purchasing DALA's shares worth an actual $109,200.00 and the remaining $255,891,060.00 investment would be considered a "premium" for the purchased shares.

92.     Since 2012 PALM and/or DALA, directly and through the use of brokers, have been unsuccessful in finding a funding source that believed an investment of $250,000,000.00 in exchange for stock currently valued at $109,200.00 was a good investment.

**DEFENDANTS ROLE IN OBTAINING PROJECT FUNDING FOR THE MEXICAN AIRPORT PROJECT**

93.    During several calls between Cope, Plaintiff and my counsel which occurred over a period of in or around two months (late August 2014 through early October 2014), Cope would discuss the Mexican Airport Project and her role in length. On one such call, which occurred in late September of 2014, Cope confirmed that she had been attempting to secure funding for this project (as well as two companion projects) since on or around 2012; and, seeing it to completion was of the utmost importance to her.

94.    During this period of time, Cope would communicate with Plaintiff and/or my counsel on an almost daily basis. Cope initially attempted to solicit Plaintiff to invest in the Mexican Airport Project.

95.    On July 5, 2014, during a call between Moran, Plaintiff and my counsel, Moran confirmed that he had been on a call between Cope, Grantham and the President of Mexico in or around August or early September of 2014. During the course of said call, Cope and Grantham and the President of Mexico were discussing Cope and Grantham's role in finding a funding source for this project. Moran specifically recalled the conversation, in part, because he warned Grantham not to get involved with the President of Mexico as he was under investigation for misuse of funds (allegedly he and his wife had used public funds to live a lavish life-style).

96.    Defendants DeLape, Karrington and Legendary were also involved in the same capacity as Grantham and Cope. On a call between DeLape, Albi, Plaintiff and my counsel in or around 10/4/14 initial conference call with DeLape, DeLape confirmed that he was working with Cope and Grantham to find funding for the project.

97.    The defendants sought to obtain an investor to fund the Mexican Airport Project for the purpose of receiving pecuniary gain in the form of a commission; and, upon information and well-founded belief, securing a well-paid position in the project management company or entity. While the financial reward for the actual investor certainly seems bleak at best, the financial reward for a broker of such a deal (who would not need to spend their own funds) enticed the defendants to attempt to procure an investor.

98.    On or before 2014, Windsor also became another player seeking investors for the project funding. On July 5, 2014, during a call between Moran, Plaintiff and my counsel, Moran confirmed that he had been on a call with Grantham in April of 2015. During the course of said call Grantham had proposed the idea of beginning a separate company, Grantham, Moran and Windsor to act as the financing company for the Mexican Airport Project. In discussing Windsor, Grantham confirmed that he had been *working* with him and Cope on the Mexican Airport Project for months. Moran refused to start the new company; and at such time, Grantham incorporated with Cope and Windsor instead.

99.    Plaintiff did not learn of the connection between Cope and Grantham until May of 2015 after he began to uncover the fraud schemes set forth in this Complaint; and, in fact, Grantham and Cope refrained from officially forming a company with their partner, Windsor until May 27, 2015.

17

**Scheme to Defraud Plaintiff of Assets**

100.    The defendants could not find project funding for the Mexican Airport Project, likely because it was a poor business venture.

101.    They therefore conspired and agreed to induce Plaintiff into physically parting with one or more of his assets; which, they then intended to utilize, without Plaintiff's knowledge, to obtain the $250 million investment funds.  The details of this scheme and participants were confirmed to Plaintiff on or around June 2, 2014, by Grantham's attorney, Kimberly Johnson, Esquire.

102.    Grantham and his co-defendants had used Attorney Johnson to negotiate and review the contracts associated with Plaintiff's assets and the Mexican Airport Project.  During the course of said representation, Attorney Johnson came to learn of the above referenced scheme in detail and that her service had been used to assist the defendants in committing frauds against Plaintiff.

103.    Attorney Johnson also became concerned as she learned that one of the individuals in Mexico associated with this deal was on the US Treasury's OFAC list.[17]

104.    Further, she had grave concern for the safety of Plaintiff's UBS Gold Certs and CDs held by Grantham, as Grantham confided in Attorney Johnson that he was contemplating burning his barn (his only remaining asset) to the ground and telling Plaintiff that his physical assets had been inside the destroyed structure.

**ADDITIONAL PREDICATE ACTS**
**SBLC ATTEMPTED SCAM**

105.    Where Jesse C. Grantham asked me to invest the deeds to my properties with S.A.L.T against a credit line that he had in Place with BB&T bank.  He then asked me to open an account for a company that we would both Form called Riad and Grantham, and use my personal credit line at Wells Fargo to open the account and then he would transfer 10 million dollars into the Account.

106.    That never happened, so John Moran the CEO of S.A.L.T stepped in and asked me to deposit money in S.A.L.T's account for the purpose of purchasing instruments, Bank Guarantees, that he told me that S.A.L.T has their own trading desk and that we can utilize the Riad and Grantham account to deposit the millions in Profit.

107.    I asked John Moran and Jesse C. Grantham for references and proof of funds that they both failed to provide.  I waited 2 months for them to provide that information, and then I shut down the Riad and Grantham account after I confirmed that they were out there using my name for credibility, and I since learned about the transaction detailed above and other transactions through Issac Addo, whereby they were attempting to defraud other people claiming they can make them money.

108.    On or about 5/9/15 Plaintiff and Moran had a conference call, wherein I explained my concern that Grantham and S.A.L.T. had yet to return his UBS assets and had failed to fund the

---

[17] In or around such time, Attorney Bates immediately resigned as counsel.

RGH bank account as Grantham had repeatedly represented for the past month.  Plaintiff explained that according to Grantham's representations, RGH needed to obtain additional bank guaranteed SKRs for all the assets that Grantham represented were being monetized through the US government (i.e. they needed SKRs in addition to the 2 Grantham had allegedly procured from BB&T bank for the Sagittarius 277817 Cert and the Capricorn 27778126 Cert).

109.    I further explained that Grantham and I had spoken with the President of BOA as to the possibility of procuring these bank guaranteed SKRs.  The President of BOA had represented on the call that BOA had stopped doing such SKRs approximately 5 years before due to the cost of insurance.  He had further represented that if Grantham and S.A.L.T. were indeed able to transfer the contemplated 1 to 2 billion dollars into the RGH bank account at BOA, he would have significant ability to approach the BOD of BOA and convince them to consider restarting their SKR program for the benefit of such a large client.

110.    Plaintiff explained therefore that the funds were necessary to obtain the SKRs Grantham represented were required, not as banking fees, but to make RGH a significant enough client that the President of BOA could convince the BOD to restart an expensive SKR program for 1 client.  Moran represented that if Grantham's funding from Goldman Sachs was being slowed down then he had a way to produce the liquidity or an amount close quickly.

111.    Over the course of conversations that occurred through email and phone calls (from PA to NV) from 5/9/15 through 5/13/15 Moran attempted to convince Plaintiff to deposit 500 thousand Euros into an escrow account with an attorney in Costa Rica.

112.    On the initial 5/9/15 call, Moran represented that there was a counterparty, introduced through Jefferson Blair, who worked with wealthy Chinese investors to issue a SBLCs that would put up the banking fees (500 thousand euros); and, Meryll Lynch would thereafter issue a SBLC in the amount of 250 million Euros.  The SBLC would thereafter be monetized and the funds traded on through a top trader with 50% of the profits going to the counterparty and 50% of the groups being deposited in RGH for the purpose of funding the RGH bank account.  Moran sent Plaintiff an email chain between himself and Robert Keelan, Jr. of Merrill Edge CRPC dated 5/7/15 wherein the alleged SBLC is referenced.

113.    Moran further sent a proposed JVA that was largely unclear and indicated in several areas that Plaintiff and Moran would be responsible for the initial banking fees.

114.    My counsel told me to be cautious of this proposed deal as the JVA's language indicated "brokers" wrote it and there were many scams involving SBLCs that offered a SBLC in the hundreds of millions after a "victim" paid $500,000.00 or a $1,000,000.00 fee placed often in escrow (with a conspiring attorney or an attorney who released the escrowed funds prior to realizing they had been used in a scam).

115.    She and I called an investment banking attorney for advice on the contemplated transaction; we called him as he is the Chairman of an investment bank in London and South Africa.   We inquired whether SBLCs could in fact be issued and traded on in this fashion at all.  He represented that he could in fact trade on an SBLC, but again to be very careful as very few entities were capable of trading on SBLCs legitimately and to proceed forward with caution.

116.    I sent a LOI wherein I refused to permit any party to put up any funds in escrow (so as to ensure there was no potential for any party to be a victim); instead, if banking fees were to be paid by the counterparty, then they could simply produce a POF and agree to pay the funds directly to the issuing bank.  After the SBLC was issued and monetized by the counterparty, they would then receive any and all fees they had initially paid to the bank.

117.    We then had a call with Moran wherein she stated that she had drafted a simple LOI to this effect and that I had serious concerns about the legitimacy of the contemplated transaction.  I explained that I would not be involved in any such transaction where funds were placed in escrow, regardless of whose funds these were; as there were too many scams were the escrowed funds were stolen. I explained that he would only consider moving forward if the funds were paid directly to the bank after a full due diligence was done by Moran and provided to me on all potential parties and the banks and bank officers involved.   This would include POFs from the counterparty, references to past transactions successfully completed and written letters from any and all bank officers involved confirming the amount of the banking fees and that upon payment of same the alleged SBLC would be issued and traded.

118.    I asked Moran if he had completed any successful transactions with Jefferson Blair in the past.  Moran represented that he had completed transactions with Jefferson Blair and that he was certain that Mr. Blair was legitimate and like Grantham had significant government clearances that allowed him to do these deals.

119.    On 5/13/15 Moran sent Plaintiff a wholly new agreement written by Jefferson Blair and/or my counsel.  In this proposed agreement, the parties were to immediately enter into the transaction wherein Plaintiff and Moran were to tender 500 thousand Euros to a law firm in Costa Rica.  The contract's terms purported to indemnify any party from any criminal conduct committed during the course of the contract and provided only civil remedies which could be brought within the jurisdiction of Costa Rica.

120.    Plaintiff immediately contacted Moran who then represented for the first time that it should be all of Plaintiff's money used for the banking fees.

121.    Plaintiff refused to continue with the transaction as it was clearly an attempt to defraud him of his moneys.  On or around that day, Plaintiff contacted DeLape, whom he still had a favorable business relationship with and summarized his concerns regarding Moran's alleged transaction.

122.    DeLape represented to Plaintiff during this call that he had fallen victim himself to the exact same scam (although the payment was $900,000.00 USD) with Jefferson Blair about a year before and that Baker Botts was retained to settle the matter and get Jefferson Blair to return the money.

123.    Plaintiff then advised Grantham of this on a call on or about the same time; wherein Grantham pretended to have no knowledge of these events and represented that S.A.L.T. and him had legitimate entities who would do such SBLC deals and he was unsure why Moran had introduced Jefferson Blair.

124.   In fact, it is believed that Grantham was in on this scam as he has no entities who could issue an SBLC and he further disclosed in a text message sent to Plaintiff in or around June of 2015 that William Windsor was in on the Jefferson Blair SBLC deal.

125.   Moran had initially concealed from Plaintiff that William Windsor, who has a known criminal history, was involved in the SBLC deal; therefore, Plaintiff never represented to Grantham that Windsor was involved.  Accordingly; Grantham had substantially more knowledge as to the individuals involved in the SBLC scam then he originally let on. Additionally, Windsor was brought in as a partner of Grantham and Cope's in GCW in or around the exact same time (GCW was formed on 5/27/15, however, it was operating prior to the date of the formation as a partnership of the 3 members, Grantham, Cope and Windsor).

126.   GCW is the entity that entered into or attempted to enter into a JVA with PALM (the owner of the Mexican project) wherein it was required to fund approximately $250 million dollar airport.  Same was to be funded, according to Kimberly Johnson, Esq., by the use of the UBS assets and/or other colored copies of Plaintiff's bonds (laminated).

127.   When Plaintiff received the text message from Grantham stating that Windsor was involved in the contemplated SBLC transaction, Plaintiff contacted Moran and confronted him about his affiliation with Windsor[18].  Moran represented that Windsor had a good banking contact out of NY and that he had introduced Windsor to Grantham in 2014.  Moran represented that he had warned Grantham that Windsor was not to be trusted, but was unable to explain to Plaintiff why if Moran knew Windsor had a criminal background for banking fraud and otherwise shouldn't be trusted, he would bring Plaintiff a transaction involving Windsor and Jefferson Blair to begin with.  Moran was unable to provide any answer and left the call stating that he needed to go to physical therapy and his daily massage.

---

[18] According to information derived from public records, Windsor is in fact a career criminal with a slew of convictions and pleas for embezzlement, theft, banking fraud and organized crime (RICO) type offenses:
(a) In the jurisdiction of Florida, on or about 1/20/1989 he was convicted for *embezzlement of a banking type instrument, fraud-business operation* in violation of Florida Code 517.301(1)(a)(3), (b) In the jurisdiction of Florida, on or about 11/18/1980, 2/13/1981, 1/26/1988 he was convicted for one or more counts of *fraud-use of a device* in violation of Florida Code 517.302(1) and 832.05(2)(a), (c) In the jurisdiction of Florida, on 1/26/1988 and on or after 4/28/1973 he was convicted of one or more counts of *check fraud* in violation of Florida Code 517.302(1), (d) In the jurisdiction of Florida, on 1/20/1989 and 2/02/1988 he was convicted of *grand theft* in an amount exceeding $300.00 and less than $20,000.00, (f) In the jurisdiction of Florida, on 1/26/1988 he was convicted of fraud by false impersonation, (g) In the jurisdiction of Florida, on or about 7/27/1990 a plea of nolle proseque was entered for one or more counts as to the following crimes, *grand theft in the 1st degree, grand theft in the 2nd, grand theft in the 3rd degree, organized fraud and RICO*, (h) In the jurisdiction of Florida, on 10/2/2010 and 7/8/2010, he was charged (conviction status uncertain) for an unclear offense, which referenced the term "hold US Marshall", (i) In the jurisdiction of Maryland on 11/13/2003, a person named William Windsor and fitting his general physical description, entered a plea of nolle proseque to *assault in the second degree*, and (j) In the jurisdiction of the Northern District of Illinois, Eastern Division, a judgment of default was entered in *SEC v. Collins*, et al based in part, on the sworn affidavit of George J. Miller, branch chief of the SEC-Midwestern Regional Office.  In *SEC v. Collins*, The Gateway Association (Ill. Co.) had four bank accounts that held investors' funds, totaling in or around $2,046,700.00; Windsor intentionally misappropriating $846,700.00 on 5/28/1998 from said accounts and used same for his own personal benefit.

21

128.     DeLape in or around 2013 falsely represented to Mr. Issac Addo, an individual involved in international banking transactions, that he had a contact (Grantham and S.A.L.T.) who would be able to assist in monetizing hard to work with historical assets.  DeLape represented that Grantham and S.A.L.T. had substantial financial capacity; namely a bank account at Wells Fargo, NA, holding in or around $14 billion dollars. That the origin of same was legitimate; and, Grantham had made the funds over a period of three (3) years during which time he was given access to one of the top trading platforms in the US through an introduction made by certain high-valued political connections after Grantham's military service had ended.

128.     Based on the above statements, Mr. Addo was introduced to Grantham, Moran and began to refer business to their company S.A.L.T.

129.     Pursuant to the introduction, Mr. Addo brought multiple transactions to Grantham through DeLape, including, (1) the monetization of a Venezuelan bond, (2) a transaction involving $500 million tranches, (3) a gold (AU) SKR to be issued by Japan wherein Grantham and S.A.L.T. failed to perform and (4) a purchase of gold from Mr. Addo's connection wherein Grantham represented he had the capacity to purchase the gold, but continued to make excuses as he in fact could not purchase the gold.  In addition to the oral statements and confirmations by Grantham, most or all of the documents relating to these transactions were executed by Moran on behalf of S.A.L.T. as well.

130,     DeLape has been the recent defendant in many similar suits alleging that he, in his individual capacity and representative capacity (there for Benchmark Capital and Blackstone Water ) made false representations with the intent of inducing the respective Plaintiffs into entering making six-figure loans to Benchmark Equity Group, LLC.  The following allegations are as represented by the plaintiffs in their respective lawsuit:
  (a) Manny Bello ("Bello") made a loan of $765,000.00 to Benchmark. On April of 2012, DeLape made a series of telephone calls asking Bello for a loan to serve as the "final piece" of an exciting business opportunity relating to international bonds (no connection to the bonds in the instant action or Plaintiff).  DeLape represented that he had already invested millions of his own funds through Benchmark; and, would personally guarantee the loan with a property in Panama. Bello made said loan on May 21, 2012, and signed a promissory note as CEO and Chairman of Benchmark obliging Benchmark to repay the loan within 90 days.  Bello alleges that DeLape failed to repay the loan; and, further that DeLape, in his individual and representative capacity induced Bello into making the loan as he never intended to repay said loan.
  (b) On March 58, 2012, L&A Investment Group ("L&A"), a company owned by the DeLape's then friends, Lance and Alicia Smith, made a loan to Benchmark in the amount of $150,000.00.  L&A in exchange for the loan, received what are purported to be royalty rights in a coal mine, Mine No. 7, in VA, that DeLape represented was substantially owned by Benchmark; and a promissory note from Benchmark only.[19]  The loan was payable on or before August 31, 2012. L&A claims that Benchmark never make any payments on the promissory note or the royalty agreement.  They further claim that they were fraudulently induced into making the loan, because Benchmark does not own the coal mine and the loan

---

[19] L&A initially requested that DeLape sign a personal guarantee for the loan, however, he represented that Benchmark was flush with cash and same was not necessary.

money was in fact "embezzled out of Benchmark by [Frank] DeLape and used to pay for the DeLapes' lavish lifestyle rather than coal mining."

(c) After Midnight Group ("AMG") invested $1 million in Blackstone Worldwide Partners ("BWP"), another company owned by DeLape. AMG made the investment based on the following representations by DeLape: (i) that BWP "acquired all of the rights to 23 million tons of coal located at the Fiatt Coal Fields in Cuba, Illinois"; (ii) that BWP would procure a $25 million loan to process and transport the coal and (iii) all BWP needed was the $1 million loan in order to construct a road to the coal site. As with L&A and Bello's claims, AMG alleged that DeLape and BWP did not make payment by the due date. there February 2012; and further that DeLape fraudulently induced them into making the loan as he never intended to repay the loan and the statements concerning the investment opportunity were materially false.

131. When Plaintiff discussed the bankruptcy and creditors with DeLape in December of 2014, the two had already gained a rapport; and, Plaintiff believed DeLape when he represented that he simply wanted to turn his luck around after some bad investments and would only bring competent, solvent and otherwise trustworthy opportunities to Plaintiff.

**MTN ESCROW/OIL TRANSACTION**

132. Copies of the following emails are attached as App. 7. An Email from John Moran, CFO of S.A.L.T, Jesse C Grantham Company, sent Friday April 18, 2014 at 12:30 Pm, from Jmoran@icloud.com to Kevin Wynne
I would refer the escrow at Wells Fargo Advisors in New York where my banker would facilitate confirmations. He is one of the top transactional bankers in the country. His clientele list is a whos who. Let me know if this is acceptable.

133. An Email response from Kevin Wynne to John Moran CFO of S.A.L.T on April 18 11.06 a.m Kevin Wynne
We're open to using Wells Fargo for escrow subject to investor approval.
Here Kevin is feeling secure because John is using a reputable banks name to convince him that this is a safe transaction that he should place his money with S.A.L.T for investment purposes.

134. An Email from John Moran, CFO of S.A.L.T, Jesse C Grantham Company, sent Friday April 18, 2014 at 4:35 Pm, from Jmoran@icloud.com to Kevin Wynne, Re: Escrow .
John Says, good news, we have received our Aramco Number. This will be one of the confirmations necessary done by our banker. I will reveal the banker at wells next.
Clarification. This is clearly a false statement. S.A.L.T does not have an Aramco number, That can be verified through Aramco directly. SALT does not own a refinery and has no access to any primary contracts that mandate an Aramco Number. This is a statement clearly made to induce someone into entering into a transaction by claiming a method of verification that most people are not aware of.

135. An Email response from Kevin Wynne to John Moran CFO of S.A.L.T on April 18 11.06 a.m Kevin Wynne

136. We're open to using Wells Fargo for escrow subject to investor approval.

Here Kevin is feeling secure because John is using a reputable banks name to convince him that this is a safe transaction that he should place his money with S.A.L.T for investment purposes. An Email from John Moran, CFO of S.A.L.T, Jesse C Grantham Company, sent Friday April 18, 2014 at 16:51:28 Pm, from Jmoran@icloud.com to Kevin Wynne, wynnekt@aol.com< Re: Escrow> .

I am on my iphone
Split 50-50, Exxon sells us fuel, requires $50 million on account. I have the MTN deal sold yet could offer some amount. Bcl is sent by my banker after funds in escrow. Bank will guarantee safety of the funds. Deals for Jet fuel D2 Mazut and oil available. Will share contracts only after funds in escrow. Can purchase fob or in some cases CIF. Oil from Iraq, Libya and Venezuela .

137.    Here John Moran is clearly trying to defraud Kevin into believing that if he deposits money in S.A.L.T's account he can be part of these ongoing transactions. First, there is an embargo against Libya and Mazut is illegal to import because of its high sulfur content. If S.A.L.T and Jesse C Grantham, or John Moran, had any evidence of prior performance and had 50 million as they claimed in the account that is required by Exxon, why would they be attempting to defraud Kevin Wynne, by demanding an escrow for a transaction he is not involved in.  This is a known practice to induce someone to part with their money to be part of a transaction that does not exist.

138.    An Email from John Moran, CFO of S.A.L.T, Jesse C Grantham Company, sent May 5th 2014 5:48 pm, from Jmoran@icloud.com to Kevin Wynne, Re: option .
John writes. How are you doing providing me the option relationship of capital Strategies Group Ltd. Geneva Switzerland with our deal. I have funds committed to move forward.
Here John is requesting options to see how he can get the funds from this contact from Kevin to do this so called MTN purchase. This transaction now shifted from an oil transaction to a banking instrument transaction that requires cash to purchase these banking instruments. This is a strategy used to bring in an investor, using established institution names like exxon and Wells Fargo and associate them with S.A.LT and try to create credibility to convince you it is safe to put money with them. Once that is done, they then create another irrelevant transaction to get money into S.A.L.T's account and sell you on profit sharing.

139.    An Email response from Kevin Wynne to John Moran CFO of S.A.L.T on May 6, 2014 at 9:52
John, the call option fee is returned if the buyer does not close on the purchase since the providers bank will incur all the fees. It would be great if we can all jump on a conference call with Tina at helping hands to review everything.

140.    In this email, Kevin is starting to hesitate to move forward, and is requesting more information, as the transaction has changed, and now he is being required to put up money that he though S.A.L.T, and Jesse C. Grantham, the big oil trader was supposed to provide. As expected, the shift in the transaction starts to create question and doubt.
An Email from John Moran, CFO of S.A.L.T, Jesse C Grantham Company, sent May 6, 2014 12:56 pm, from Jmoran@icloud.com to Kevin Wynne,  Paul Remirez: mtn escrow procedures/ Escrowed call option/ fee agreement.  Importance: High

24

Part 1 is getting the MTN, that is your responsibility.  I am not participating in Part 1 profits
I am asked to have a working relationship without verbal dialogue from Capital Strategies for
myself and my banker.

141.    This is where the fraud becomes clear, Jesse C. Grantham, and S.A.L.T and John Moran,
are clearly requesting that the funds be put up in escrow for the MTN that they are supposed to
provide, and you will see from the response that Kevin Wynne writes back that it is starting to be
clear to him that S.A.LT has no credit and no money and was trying to induce them into entering
into a transaction and placing their funds in escrow to profit share on a non existing transaction.
An Email from John Moran, CFO of S.A.L.T, Jesse C Grantham Company, sent May 6, 2014
12:56 pm, from Jmoran@icloud.com to Kevin Wynne,  Paul Remirez: mtn escrow procedures/
Escrowed call option/ fee agreement may 6 2014 at 10:01 am
We would prefer you put up the option money for the first transaction.  If it goes through
successfully, Amy can most likely get HH to post the option money on future MTN deals .
SALT's creditworthiness comes into play.  If you aren't using cash, then we need to understand
how you intend to execute the transaction.

142.    Kevin is clearly doubting the credibility and capability of S.A.L.T.  He is asking this
multi million dollar company to prove its capability before they put out the cash into the escrow
account.  Clearly if S.A.L.T has done these transactions before they would be capable of
providing a proof of funds or a bank comfort letter, which they have clearly failed to do, because
they are attempting to convince this party to put money into their own account.
An Email from John Moran, CFO of S.A.L.T, Jesse C Grantham Company, sent May 6, 2014
12:56 pm, from Jmoran@icloud.com to Kevin Wynne,  Paul Remirez: mtn escrow procedures/
Escrowed call option/ fee agreement
Part 1 getting the MTN, is your responsibility.  I am not participating in Part 1 profits.
Also the clearing house at any time can declare the buyer is not credit worthy and take the
money.

143.    As you can see here John is realizing that he is being called out and is trying to get out of
the deal.  He is now claiming that this funding responsibility is on Kevin and Paul's group, and
he is not involved in that process.

144.    An Email response from Kevin Wynne to John Moran CFO of S.A.L.T at 10:54am,
The fee is meant to be a guarantee of S.A.L.Ts performance and any hesitation on your part to
guarantee your own performance needs further discussion so we understand. The only difference
between posting the call fee and guaranteeing it in the event of Salt Defaulting is timing.  The
escrow agreement is less than 3 pages and the purpose of the call option fee is clearly spelled
out. Is there anything else about it that you have questions about.  Arent you using Cash to
purchase the MTNs.

145.    Kevin here has clearly seen that he was going down the path of being taken advantage of
and defrauded.  The questions being asked here are very clear and this is where John is at the end
of the transaction, and his attempt to defraud has failed.
An Email from John Moran, CFO of S.A.L.T, Jesse C Grantham Company, sent May 6, 2014
11:00:47 am pdt, from Jmoran@icloud.com to Kevin Wynne,  Paul Remirez: mtn escrow
procedures/ Escrowed call option/ fee agreement

The problem is not SALT's performance, the problem is remitting funds to a source that doesn't communicate.   This is not acceptable banking policies.
How much is the option fee 500 million euros?
I gave your group the luxury of communication with my top rated banker.  Doesn't anyone have confidence in Wells fargo?.
Funding movies and boxing events costs millions yet no one interested in investing in this project I find it strange.

146.    John Moran clearly confuses subjects again and realizes that his opportunity in getting funds deposited into S.A.LT's escrow account are ruined.   This is exactly identical to the transaction I had with S.A.LT

## COUNT I
## BREACH OF CONTRACT
### (Riad v. S.A.L.T.)

1.    The allegations contained in this Complaint, and all related appendixes, are incorporated herein, as if set forth in full.

2.    Defendant entered into a binding and enforceable agreement with Plaintiff regarding the Sagittarius Gold Certs and the 2 CDs.

3.    Pursuant to the clear and unambiguous terms and conditions of the agreements, including, without limitation, paragraphs 3 and 5.4, S.A.L.T. was required to monetize the assets for the benefit of RGH and Riad and finance same.

4.    Pursuant to the clear and unambiguous terms and conditions of the agreements, including, without limitation, paragraphs 9.1, 9.2 and 9.5, the assets automatically reverted back to Plaintiff's legal possession if same were not monetized and/or Plaintiff was not tendered payment for any monetization on or before March 5, 2015.

5.    S.A.L.T. did not monetize the assets for the benefit of Plaintiff or RGH as of the date of this Compliant; and, neither S.A.L.T. nor RGH has returned the assets to Plaintiff.  Instead its President and shareholder, Defendant Jesse Grantham, has embezzled said assets and otherwise taken possession of same, under false pretenses, and continues to refuse to return same to Plaintiff's possession.

6.    Plaintiff entrusted the 2 Gold CDs and the Sagittarius Certificate to Grantham on 16th January 2015 and otherwise performed all conditions, promises, obligations under the terms of the Cert. Agrmt.

7.    Plaintiff requested the return of the CDs and Sagittarius Certificate beginning in or about March of 2015.

8.    Defendants' failure to place the assets in safekeeping, monetize the assets and return the assets since 2nd of March, 2015, has caused Plaintiff damages:  namely, Plaintiff does not have

possession of his assets and Plaintiff has lost interest on his assets and a business opportunity to monetize same through a lease with Mega Global Assets in London in the amount of $ 6 million dollars and, otherwise does not have possession of his assets

9.     As a direct and proximate result of the Defendants' breaches of the agreements, Plaintiff is entitled to payment for the loss of interest and business opportunity in the amount of $6 million dollars and is entitled to an Order requiring the immediate return of Plaintiff's assets.

WHEREFORE, Plaintiff Joseph Riad respectfully requests entry of judgment in his favor and against Defendant, S.A.L.T., for the following relief:

A.     An Emergency Interim Order placing the Sagittarius Gold Certificate 2777817 and the two Certificates of Deposit in a constructive trust/safekeeping; and, freezing any and all bank accounts of GCW and S.A.L.T.

B.     Damages, including compensatory, incidental and consequential, simple interest and legal interest, the gold value of the UBS Gold Certificate (if not returned to Plaintiff) and Currency Value of any Certificate of Deposit (if not returned to Plaintiff).

C.     The return of said assets to Plaintiff, free and clear of all liens and encumbrances.; and, (b) make return of said assets by personally delivering same to Plaintiff at Bank of America, Philadelphia, Pennsylvania, (932 Chestnut St., Philadelphia, PA) at 12:00 noon on the first banking day following the date of the Order.

C. Damages, including compensatory, incidental and consequential, simple interest and legal interest[20];

D.     Any and all other such relief as this Honorable Court may deem appropriate.

## COUNT 2
## BREACH OF CONTRACT
### (Riad v. Jesse Grantham)

1.     The allegations contained in this Complaint, and all related appendixes, are incorporated herein, as if set forth in full.

2.     Defendant entered into a binding and enforceable agreement with Plaintiff regarding the Sagittarius Gold Certs and the 2 CDs.

3.     Pursuant to the clear and unambiguous terms and conditions of the agreements, Jesse Grantham was holding said assets as a safekeeper for RGH and Plaintiff; for the purpose of presenting same for safekeeping with BB&T Bank, 401 W. Main Street, Louisville, Kentucky. *See, App. 5 (SKR).*

4.     Pursuant to the clear and unambiguous terms and conditions of the Cert. Agreement, including, without limitation, paragraphs 9.1, 9.2 and 9.5, the assets automatically reverted back to Plaintiff's legal possession if same were not monetized and/or Plaintiff was not tendered payment for any monetization on or before March 5, 2015.

5.     Pursuant to the clear and unambiguous terms of the SKR, Grantham was unequivocally required to return said assets to Plaintiff on or before 30th January, 2015, if said

---

[20] Simple and legal interest for the period of time Grantham, Cope and GCW unlawfully held Plaintiff's assets.

assets were not accepted or otherwise placed in safekeeping by BB&T Bank, 401 W. Main Street, Louisville, Kentucky by 30th January, 2015. *See, App. 5 (SKR).*

6.     S.A.L.T. did not monetize the assets for the benefit of Plaintiff or RGH as of the date of this Compliant; and, neither S.A.L.T. nor RGH has returned the assets to Plaintiff.  Instead its President and shareholder, Defendant Jesse Grantham, has embezzled said assets and otherwise taken possession of same, under false pretenses, and continues to refuse to return same to Plaintiff's possession.

7.     Plaintiff entrusted the 2 Gold CDs and the Sagittarius Certificate to Grantham on 16th January 2015 and otherwise performed all conditions, promises, obligations under the terms of the Cert. Agrmt.

8.     Grantham repeatedly falsely represented to Plaintiff, Plaintiff's counsel, Frank DeLape and others that the Sagittarius Certificate had been taken on deposit and was in safekeeping, with full banking responsibility, with BB&T Bank, 401 W. Main Street, Louisville, Kentucky.  Plaintiff repeatedly requested copies of said bank SKR; and, was repeatedly told by Grantham that he would provide same to him when they met; however, as the representations were false and there was no SKR from BB&T, Grantham never provided a copy of such SKR from BB&T to Plaintiff.

9.     Plaintiff requested the return of the CDs and Sagittarius Certificate beginning in or about March of 2015.

10.    Defendant's failure to place the assets in safekeeping and failure to return said assets to Plaintiff on or before the 30th of January, 2015, has caused Plaintiff damages:  namely, Plaintiff does not have possession of his assets and Plaintiff has lost interest on his assets and a business opportunity to monetize same through a lease with Mega Global Assets in London in the amount of $ 6 million dollars and, otherwise does not have possession of his assets.

11.    As a direct and proximate result of the Defendants' breaches of the agreements, Plaintiff is entitled to payment for the loss of interest and business opportunity in the amount of $6 million dollars and is entitled to an Order requiring the immediate return of Plaintiff's assets.

WHEREFORE, Plaintiff Joseph Riad respectfully requests entry of judgment in his favor and against Defendant, Jesse Grantham, for the following relief:

A.     An Emergency Interim Order placing the Sagittarius Gold Certificate 2777817 and the two Certificates of Deposit in a constructive trust/safekeeping; and, freezing any and all bank accounts of GCW and S.A.L.T.

B.     Damages, including compensatory, incidental and consequential, simple interest and legal interest, the gold value of the UBS Gold Certificate (if not returned to Plaintiff) and Currency Value of any Certificate of Deposit (if not returned to Plaintiff).

C.     The return of said assets to Plaintiff, free and clear of all liens and encumbrances.; and, (b) make return of said assets by personally delivering same to Plaintiff at Bank of America, Philadelphia, Pennsylvania, (932 Chestnut St., Philadelphia, PA) at 12:00 noon on the first banking day following the date of the Order.

C. Damages, including compensatory, incidental and consequential, simple interest and legal interest;

        D.     Any and all other such relief as this Honorable Court may deem appropriate.

## COUNT 3
## BREACH OF CONTRACT
### (Riad v. S.A.L.T. and Jesse Grantham)

1.  The allegations contained in this Complaint, and all related appendixes, are incorporated herein, as if set forth in full.

2.     On or about the first week of May 2015, Defendants entered into a binding and enforceable settlement agreement with Plaintiff regarding the Sagittarius Gold Certs and the 2 CDs.

3.     Pursuant to the clear and unambiguous terms and conditions of the agreements, Jesse Grantham, individually, and on behalf of S.A.L.T. (as President and shareholder of S.A.L.T. and shareholder of RGH) agreed to immediately return the above referenced assets, free and clear of all liens and encumbrances, to Plaintiff.

4.     This was subsequently confirmed in writing between the parties and counsel; and, it was further agreed pursuant to emails between Mickala Rector, Esq., and Kimberly Johnson, Esq. that Grantham would immediately return the assets to Plaintiff upon Plaintiff's execution of a retraction letter (relating to an alleged offer Grantham/S.A.L.T/RGH) had made to the U.S. government and an agreement to wind down the company and dissolve same upon return of the assets and finalization of all other acts of winding down the company.

5.     Plaintiff provided three different retraction letters and fully agreed to dissolve the company in accord with the agreement.

6.     However, Attorney Bates on the 26th of May, 2015, confirmed she was no longer representing Mr. Grantham (and subsequently confirmed orally that she in fact was no longer representing either Mr. Grantham or S.A.L.T.) because,

    (a)   After being provided with the requested documents (see above), Grantham and S.A.L.T (individually and as a shareholder of RGH) refused to return Plaintiff's assets per the settlement agreement she had negotiated with their authority; and the refusal was based on the following:

        (i)     Grantham, Cope, Windsor, S.A.L.T., Moran and GCW had intended to defraud Plaintiff of his assets in order to fund the Mexican Project and to that end that her service had been used to perpetrate such fraud and she would not be involved in such actions, and thus never intended to return the assets, but were only using the alleged settlement to buy time and delay the return of the assets; and,

        (ii)    Grantham had asked her if he could steal Plaintiff's assets by setting fire to his barn and telling Plaintiff that he had kept the assets in his barn and they had been destroyed in the fire.

29

7.      Grantham and S.A.LT. repeatedly failed to tender the above assets to Plaintiff and any of his representatives who offered to meet Grantham near his residence.

8.      Defendants' failure to return the assets to Plaintiff has caused Plaintiff damages:  namely, Plaintiff does not have possession of his assets and Plaintiff has lost interest on his assets and a business opportunity to monetize same through a lease with Mega Global Assets in London in the amount of $ 6 million dollars and, otherwise does not have possession of his assets

9.      As a direct and proximate result of the Defendants' breaches of the agreements, Plaintiff is entitled to payment for the loss of interest and business opportunity in the amount of $6 million dollars and is entitled to an Order requiring the immediate return of Plaintiff's assets.

WHEREFORE, Plaintiff Joseph Riad respectfully requests entry of judgment in his favor and against Defendants, Jesse C. Grantham and S.A.L.T., jointly and severally, for the following relief:
   A.      An Emergency Interim Order placing the Sagittarius Gold Certificate 2777817 and the two Certificates of Deposit in a constructive trust/safekeeping; and, freezing any and all bank accounts of GCW and S.A.L.T.
   B.      Damages, including compensatory, incidental and consequential, simple interest and legal interest, the gold value of the UBS Gold Certificate (if not returned to Plaintiff) and Currency Value of any Certificate of Deposit (if not returned to Plaintiff).
   C.      The return of said assets to Plaintiff, free and clear of all liens and encumbrances.; and, (b) make return of said assets by personally delivering same to Plaintiff at Bank of America, Philadelphia, Pennsylvania, (932 Chestnut St., Philadelphia, PA) at 12:00 noon on the first banking day following the date of the Order.
   C. Damages, including compensatory, incidental and consequential, simple interest and legal interest[21];
   D.      Any and all other such relief as this Honorable Court may deem appropriate.

## COUNT 4
## BREACH OF CONTRACT
### (RIAD V. LEGENDARY)

1.      The allegations contained in this Complaint, and all related appendixes, are incorporated herein, as if set forth in full.

2.      Defendant Legendary entered into a binding and enforceable agreement with Plaintiff regarding the Sagittarius Gold Certs and the 2 CDs.

3.      Pursuant to the clear and unambiguous terms and conditions of the agreements, it was to provide capable and safe monetization solutions, which required it to perform full due diligence on any and all entities involved in any contemplated transaction it introduced.

4.      Defendants Frank DeLape and William Karrington are agents of Defendant Legendary; and, Defendant Legendary is a principal of Defendants Frank DeLape and William Karrington.

---

[21] Simple and legal interest for the period of time Grantham, Cope and GCW unlawfully held Plaintiff's assets.

5.      On behalf of Legendary, Defendants Frank DeLape and William Karrington agreed to perform the due diligence and provide safe and reliable sources for monetization to Plaintiff in exchange for 30% of the monetization proceeds.  As stated in this Complaint, one of the monetization solutions provided to Plaintiff was the monetization of the Sagittarius 2777817, 2777818 Certs. And 2 gold CDs through Grantham and his trader at BB&T.  Both Frank DeLape and William Karrington represented that they spoke with BB&T bank regarding the contemplated transaction and Frank DeLape represented that Grantham had the financial capacity to perform the transaction.

6.      Neither Defendants Frank DeLape nor William Karrington spoke with BB&T to the extent they relayed; nor did they perform the due diligence on Grantham and S.A.L.T. as neither Grantham nor S.A.L.T. has the financial capacity to perform a transaction of this magnitude nor do they have the banking contacts, including the top US trader, to perform such transaction.

7.      As a direct and proximate result of Defendant's failure to do adequate due diligence, Plaintiff entrusted Grantham with the Sagittarius 2777817 Certificate and the 2 gold CDS on or about 1/16/15 and to date S.A.L.T. did not monetize the assets for the benefit of Plaintiff or RGH as of the date of this Compliant; and, neither S.A.L.T. nor RGH has returned the assets to Plaintiff. Instead its President and shareholder, Defendant Jesse Grantham, has embezzled said assets and otherwise taken possession of same, under false pretenses, and continues to refuse to return same to Plaintiff's possession.

8.      Grantham repeatedly falsely represented to Plaintiff, Plaintiff's counsel, Frank DeLape and others that the Sagittarius Certificate had been taken on deposit and was in safekeeping, with full banking responsibility, with BB&T Bank, 401 W. Main Street, Louisville, Kentucky.  Plaintiff repeatedly requested copies of said bank SKR; and, was repeatedly told by Grantham that he would provide same to him when they met; however, as the representations were false and there was no SKR from BB&T, Grantham never provided a copy of such SKR from BB&T to Plaintiff.

9.      Plaintiff requested the return of the CDs and Sagittarius Certificate beginning in or about March of 2015.

10.     Defendant's failure to place the assets in safekeeping and failure to return said assets to Plaintiff on or before the 30th of January, 2015, has caused Plaintiff damages:  namely, Plaintiff does not have possession of his assets and Plaintiff has lost interest on his assets and a business opportunity to monetize same through a lease with Mega Global Assets in London in the amount of $ 6 million dollars and, otherwise does not have possession of his assets.

11.     As a direct and proximate result of the Defendants' breaches of the agreements, Plaintiff is entitled to payment for the loss of interest and business opportunity in the amount of $ 6 million dollars and is entitled to an Order requiring the immediate return of Plaintiff's assets.

        WHEREFORE, Plaintiff Joseph Riad respectfully requests entry of judgment in his favor and against Defendant, Legendary, for the following relief:

   A. Damages, including compensatory, incidental and consequential, simple interest and legal interest, the gold value of the UBS Gold Certificate (if not returned to Plaintiff) and Currency Value of any Certificate of Deposit (if not returned to Plaintiff).

   B. The return of said assets to Plaintiff, free and clear of all liens and encumbrances.; and, (b) make return of said assets by personally delivering same to Plaintiff at Bank of America, Philadelphia, Pennsylvania, (932 Chestnut St., Philadelphia, PA) at 12:00 noon on the first banking day following the date of the Order.

   C. Damages, including compensatory, incidental and consequential, simple interest and legal interest;

   D. Any and all other such relief as this Honorable Court may deem appropriate.

## COUNT 5
## DECLARATORY JUDGMENT, 28 U.S.C. §2201
### (Riad v. S.A.L.T. and Jesse Grantham)

1. The allegations contained in this Complaint, and all related appendixes, are incorporated herein, as if set forth in full.

2. Plaintiff asserts that a declaratory judgment action should be entertained because a genuine controversy exists as to, a.) the ownership of the following assets:  Sagittarius 2777817, Sagittarius 2777818 and the two (2) CDs ; and,  b.) Grantham's, S.A.L.T.'s, and RGH's obligation to return the physical possession of said assets to Plaintiff, free and clear of all liens and encumbrances.

3. As stated in full in this Complaint, including, without limitation, in Counts 1 and 2 respectively, and, in annexed appendixes, referenced contracts the assets in question were to be returned to Plaintiff pursuant to the clear and unambiguous terms and conditions of the *Certs. Agrmt.* and SKR on or before January 30, 2015; and then, on or before March 5, 2015; said assets were required to be returned free and clear of all liens and encumbrances.

4. As stated in full in this Complaint, including, without limitation, in Count 3 respectively, and, in annexed appendixes, referenced contracts and writings evidencing the settlement agreement, the assets in question were to be returned to Plaintiff pursuant to the clear and unambiguous terms and conditions of the settlement immediately upon Plaintiff providing a retraction letter (which he provided 3 copies of at Grantham's demand) and agreement to wind down and otherwise dissolve RGH upon return of the assets (which Plaintiff further agreed to do and provided written agreements as to same on multiple occasions).

5. While Plaintiff contends that there is no factual or legal controversy, upon review of the information and contracts, Grantham, S.A.L.T. and RGH's arbitrary and baseless refusal to return the assets to Plaintiff's possession and to otherwise confirm in signed writing that it has not encumbered the assets has created a controversy between the parties, as to the assets

32

ownership and requirement to in fact return said assets to Plaintiff, free and clear of all liens and encumbrances.

6.      While Plaintiff contends that there is no factual or legal controversy, upon review of the information and contracts, Grantham, S.A.L.T. and RGH's arbitrary and baseless refusal to return the assets to Plaintiff's possession and to otherwise confirm in signed writing that it has not encumbered the assets has has cast a cloud on their title.

7.      In this particular case the above uncertainty will be forever dispelled if the Court declares the following:
> (a) The Plaintiff, Joseph E. Riad, is the lawful owner of the following assets, Sagittarius Gold Certificate 2777817, 2777818, and the two (2) gold CDs;
> (b) No other person or entity, including, without limitation, Jesse Grantham, S.A.L.T. and RGH has any legal or equitable interest in or to any of the above identified assets.

WHEREFORE, WHEREFORE, Plaintiff Joseph Riad respectfully requests entry of judgment in his favor and against Defendant, Jesse Grantham, S.A.L.T. and RGH, for the following relief:

> A. A declaratory judgment declaring that Sagittarius Gold Certificate 2777817, 2777818, and the two (2) gold CDs reverted back to Plaintiff's ownership, free and clear of all liens and encumbrances, as of March 5, 2015; and said assets are free and clear of all liens and encumbrances, as of the date and time the respective assets are returned to Plaintiff's physical possession.

## COUNT 6
### (CONVERSION)
### (Riad vs. Jesse Grantham)

1.      The allegations contained in this Complaint, and all related appendixes, are incorporated herein, as if set forth in full.

2.      Grantham deprived Plaintiff of the right to his property in and use of a chattel; namely, the Sagittarius 2777817 Certificate and the two (2) CDs from the 16th of January, 2015, through the date of the filing of this Complaint; and, will continue to deprive Plaintiff of his property until the future date when each respective asset is physically returned to Plaintiff.

3.      Grantham deprived Plaintiff of the right to his property in and use of a chattel; namely, the Sagittarius 2777818 from the 5th of February through the date of settlement, early May, 2015; when, said asset, which had remained in Plaintiff's safekeeping on behalf of RGH, was physically returned to Plaintiff.

4.      Plaintiff initially gave consent to have the chattels referenced in Paragraph 2 held in safekeeping by Defendant Grantham from January 16, 2015, for a short period of time, to be less than two weeks; during which Defendant Grantham was to travel to BB&T bank, located at 401 W. Main St., Louisville, Kentucky; and,
(a)      Place or cause to be placed the Sagittarius 2777818 placed on deposit with BB&T, who was to issue a fully backed bank guaranteed safekeeping receipt for same;

(b)     Place or cause to be placed the two (2) gold CDs in a safety deposit box at BB&T.  Said certificates were to be held there in safekeeping for RGH and Plaintiff, until they were cashed at UBS, N.A.

**2/2**

5.     Plaintiff's consent to relinquish possession of the above assets was predicated on the false representations made by Defendants Grantham, Cope, Moran, and S.A.L.T. (relating to Grantham and S.A.L.T.'s financial capacity, relationship with a top U.S. trader who allegedly had a credit line with BB&T and that Grantham would and obtain the above referenced SKR and place the CDs in the above referenced safety-deposit box immediately upon receipt of said assets; and, in no event no later than January 30, 2015).

6.     Plaintiff's continual consent to the continuation of his relinquishment of possession was induced by the false statements by Grantham and S.A.L.T. that,
(a)     Grantham had in fact placed the Sagittarius 2777817 Cert. on deposit with BB&T bank and obtained a bank guaranteed SKR reflecting same; and,
(b)     Grantham had in fact placed the two (2) gold CDs in a safety deposit box in the name of RGH at BB&T bank; and, was working to have said CDs cashed with UBS, N.A.

7.     Plaintiff's consent to the continued non-use of the Sagittarius 2777818 Cert. was induced by Grantham and S.A.L.T.'s false statements (relating to Grantham and S.A.L.T.'s financial capacity, relationship with a top U.S. trader who allegedly had a credit line with BB&T and that said trader would provide use of his credit line in consideration for the use of this and the Sagittarius 2777817 Cert. as collateral).

8.     Retention of the assets based on misrepresentations that Grantham and S.A.L.T. knew or should have known to be false voids any fraudulently induced consent and retention during this time was without lawful justification.

9.     Grantham did not have Plaintiff's consent to retain the assets after the 2nd of March, 2015; and, certainly did not have Plaintiff's consent to hold the assets in his own personal safekeeping and not at BB&T as he had continuously represented to Plaintiff, Plaintiff's counsel and Frank DeLape (amongst others).

10.     Grantham did not have Plaintiff's consent to retain the assets after he promised to immediately return same in accord with the settlement agreement reached on or about the first week of May, 2015.  Retention of said assets after the March 5, 2015, and the first week of May, 2015, dates was without Plaintiff's consent and was otherwise without lawful justification (especially as Grantham was and continues to hold same in his own personal possession and not in safekeeping at BB&T or any other bank or similar institution).

11.     As a direct and proximate result of the Defendants' conversion Plaintiff is entitled to payment for the loss of interest and business opportunity in the amount of $6 million dollars and is entitled to an Order requiring the immediate return of Plaintiff's assets.

     WHEREFORE, Plaintiff Joseph Riad respectfully requests entry of judgment in his favor and against Defendant, Jesse C. Grantham, for the following relief:

     A.     An Emergency Interim Order placing the Sagittarius Gold Certificate 2777817 and the two Certificates of Deposit in a constructive trust/safekeeping; and, freezing any and all bank accounts of GCW and S.A.L.T.

     B.     Damages, including compensatory, incidental and consequential, simple interest and legal interest, the gold value of the UBS Gold Certificate (if not returned to Plaintiff) and Currency Value of any Certificate of Deposit (if not returned to Plaintiff), treble, restitutionary and punitive damages.

     C.     The return of said assets to Plaintiff, free and clear of all liens and encumbrances.; and, (b) make return of said assets by personally delivering same to Plaintiff at Bank of America, Philadelphia, Pennsylvania, (932 Chestnut St., Philadelphia, PA) at 12:00 noon on the first banking day following the date of the Order.

     D.     Any and all other such relief as this Honorable Court may deem appropriate.

**COUNT 7**
**UNJUST ENRICHMENT**
**(Riad vs. Jesse Grantham)**

1.     The allegations contained in this Complaint, and all related appendixes, are incorporated herein, as if set forth in full.

2.     Plaintiff provided the Sagittarius 2777817 Cert and two (2) gold CDs to Defendant, Jesse Grantham, on or about January 16, 2015.

3.     Plaintiff's consent to relinquish possession of the above assets was predicated on the false representations made by Defendants Grantham, Cope, Moran, and S.A.L.T. (relating to Grantham and S.A.L.T.'s financial capacity, relationship with a top U.S. trader who allegedly had a credit line with BB&T and that Grantham would and obtain the above referenced SKR and place the CDs in the above referenced safety-deposit box immediately upon receipt of said assets; and, in no event no later than January 30, 2015).

4.     Defendant, Jesse Grantham, falsely represented to Plaintiff, Plaintiff's counsel and Frank DeLape (amongst others) that he had in fact placed the Sagittarius 2777817 Certificate on deposit with BB&T bank located at 401 W. Main St., Louisville, Kentucky, for the benefit of RGH and Plaintiff. Grantham also confirmed to me and repeatedly confirmed on a conference call to myself and my counsel, and to Rob Albi, and to Frank that he paid 250 thousand dollars for the sake keeping receipt. I demanded a copy of the receipt of payment and Mr. Grantham could never provide that.

5.     Defendant, Jesse Grantham, falsely represented to Plaintiff, Plaintiff's counsel and Frank DeLape (amongst others) that he had in fact placed the two (2) gold CDs in a safety deposit box in the name of RGH at BB&T bank located at 401 W. Main St., Louisville, Kentucky, for the benefit of RGH and Plaintiff.

6.     Defendant, Jesse Grantham, did not place the Sagittarius 2777817 Certificate on deposit with BB&T bank, 401 W. Main St., Louisville, Kentucky, for the benefit of RGH and Plaintiff (or at any BB&T bank). Defendant, Jesse Grantham, did not place either of the two (2) gold CDs in a safety deposit box at BB&T bank, 401 W. Main St., Louisville, Kentucky, for the benefit of RGH and Plaintiff (or at any BB&T bank).

7.      Defendant received the benefit of these assets, because of immediately placing them at BB&T bank, he has kept each of the above identified assets in his own personal possession; and, upon information and well-founded belief, has attempted to monetize one or more through collateralization, encashment or another form of monetization.

8.      Defendant, Jesse Grantham, received a benefit by taking these assets for his own personal use; namely, these instruments and any consideration or monetization proceeds derived from the use of same.  Furthermore, he as additionally received a benefit because he has gained false credibility by stating to others that these assets belong to him.

9.      It is unfair, unjust and unconscionable for Defendant to reap these benefits without paying Plaintiff consideration for the time he unlawfully held these assets; and, further it would be unfair, unjust and unconscionable for Defendant to be permitted to retain the assets that he has embezzled or otherwise unlawfully taken through false statements and promises to Plaintiff.

10.     By virtue of his conduct, and in the alternative to Plaintiff's breach of contract claim, Defendant has been and continues to be unjustly enriched at Plaintiff's expense in the amount of the gold value of the asset and any consideration he has derived therefrom and $6 million dollars per annum lease value until the date Defendant, Jesse Grantham, returns same.

        WHEREFORE, Plaintiff Joseph Riad respectfully requests entry of judgment in his favor and against Defendant, Jesse C. Grantham, for the following relief:
        A.      An Emergency Interim Order placing the Sagittarius Gold Certificate 2777817 and the two Certificates of Deposit in a constructive trust/safekeeping; and, freezing any and all bank accounts of GCW and S.A.L.T.
        B.      Damages, including compensatory, incidental and consequential, simple interest and legal interest, the gold value of the UBS Gold Certificate (if not returned to Plaintiff) and Currency Value of any Certificate of Deposit (if not returned to Plaintiff), treble, restitutionary and punitive damages.
        C.      The return of said assets to Plaintiff, free and clear of all liens and encumbrances.; and, (b) make return of said assets by personally delivering same to Plaintiff at Bank of America, Philadelphia, Pennsylvania, (932 Chestnut St., Philadelphia, PA) at 12:00 noon on the first banking day following the date of the Order.
        D.      Any and all other such relief as this Honorable Court may deem appropriate.

## COUNT 8
## MISREPRESENTATION
### (Riad vs. Jesse Grantham, Pya Cope, John Moran, S.A.L.T., Legendary, Frank DeLape and William Karrington)

1.      The allegations contained in this Complaint, and all related appendixes, are incorporated herein, as if set forth in full.

2.      The Defendants Jesse Grantham, Pya Cope, John Moran, Frank DeLape and William Karrington made falsely representations to Plaintiff:  As stated in the Complaint these defendants continuously represented to Plaintiff that Grantham, individually or through S.A.L.T. had had

$14 billion dollars in a bank account at WF, N.A. and had substantial political and banking contacts to assist in any means legal in completing the contemplated monetizations.

3.      At all relevant times, Grantham and Moran acted in their capacity as agents of S.A.L.T. and S.A.L.T. was a principal of Grantham and Moran; DeLape and Karrington acted in their capacity as agents of Legendary.

4.      Neither Defendants Grantham nor S.A.L.T., individually nor jointly have any significant source of liquid capital; and, certainly do not have any bank account at Wells Fargo, N.A. or any other bank with funds in an amount close to $14 billion. These defendants do not have the sufficient financial capital to provide the initial cash portion of the joint collateral. Grantham's "assets, including assets in his capacity as a 50% member of S.A.L.T.., as of 12/23/14 include some personal affects, toiletries and a possible automobile; Grantham's former marital residence was foreclosed and at all relevant times he in fact resided with his aunt and uncle in Ellisville, MS. *See, App. 8, Divorce and Property Settlement Agreement.*

5.      The Defendants knew or should have known the above statements were false, because neither Grantham nor S.A.L.T. have any bank account with funds in an amount even close to that represented; therefore the defendants should have known both the statement that Grantham and/or S.A.L.T. had said funds was false as well as the statement by DeLape that he had seen account with such funds was false (as one cannot see funds that do not exist in any account).

6.      Additionally, with respect to Defendants Grantham, Moran and DeLape, said defendants knew or should have known that neither Grantham nor S.A.L.T. had the above referenced funds because, (a) Moran and DeLape continuously needed to pay for Grantham's air fair, hotel expenses, dinners and other traveling expenses due to his lack of money. Since Moran and DeLape knew Grantham couldn't afford an airway ticket, they knew or should have known that Grantham could not individually have an account with $14 billion dollars.

7.      Additionally, with respect to Defendants Grantham and Moran, these defendants knew or should have known the statements were false as Moran was the CFO of S.A.L.T. and in his capacity as CFO knew or should have know that S.A.L.T. did not have funds in any amount close to $14 billion dollars at any time; and, at all relevant times, the signature of both Grantham and Moran was required in order to take all or substantially all banking actions on any S.A.L.T. bank account; therefore, in their activities, they knew or should have known that S.A.L.T. did not have $14 billion dollars in any bank account.

8.      The statements relating to S.AL.T. previous closing of substantially similar transactions in the banking and commodities business was false. Neither Grantham nor S.A.L.T. had ever closed a transaction of such magnitude; and, it certainly never closed a transaction of such magnitude with DeLape, Karrington or Legendary. In fact, while Mr. Addo had brought five potential transactions to Grantham and S.A.L.T. through DeLape and Legendary beginning in early 2014, Grantham and S.A.L.T. were unable to close a single transaction.

9.      With respect to Cope's statements concerning Grantham and  S.A.L.T's political capacity and her verification with her own D.C. contacts that the transaction was occurring as Grantham had generally described, Cope knew or should have known that she in fact did not confirm the

statements to the extent she claimed.  Grantham does not have political contacts and he does not work with or in consultation with such persons as Haley Barbour, Alan Greenspan and Jeb Bush; accordingly, Cope could not have confirmed any of the representations as alleged and knew or should have known her statements of confirmation were false or had a high potential to be false.

10.     The above statements were material to Plaintiff's agreement to enter into the transaction and to release possession of my assets to Grantham on 1/16/15 because (a) there would be no means to perform the alleged transaction if Grantham and/or S.A.L.T.. did not have the necessary cash collateral amount; (b) there would be no transaction if Grantham did not have the trader at BB&T bank with access to the represented credit line and willingness to utilize the assets and cash as collateral for same; (c) there would be no transaction if Grantham and/or S.A.L.T. did not have access to the US Treasury to confirm the authenticity in a written report to the trader and Plaintiff would not have relinquished possession of the UBS assets to Grantham on 1/16/15 if he had not believed that there was in fact a transaction as stated in this Complaint and the referenced contracts.

11.     Plaintiff was reasonably justified in relying on the above statements as he in fact entrusted Grantham with the UBS assets based on the representations and Cope, DeLape and Karrington each verified Grantham's statements.  Said individuals had substantial credibility as Cope was the daughter of an esteemed senator, a consultant with the US FDIC and a political lobbyist, DeLape and Karrington have readily verifiable connections to the Bush family and Karrington represented that he had connections to one of the officers at the Federal Reserve (who had been a neighbor of his since his child was in kindergarten and the two regularly discussed business after becoming friends while dropping their children off at the bus stop).

11.     As a direct and proximate result of the Defendants' conversion Plaintiff is entitled to payment for the loss of interest and business opportunity in the amount of $6 million dollars and is entitled to an Order requiring the immediate return of Plaintiff's assets.

### COUNT 9
### MISREPRESENTATION
### (Riad vs. Jesse Grantham, Pya Cope, John Moran, S.A.L.T., Legendary, Frank DeLape and William Karrington)

1.     The allegations contained in this Complaint, and all related appendixes, are incorporated herein, as if set forth in full.

2.     The Defendants Jesse Grantham, Pya Cope, John Moran, Frank DeLape and William Karrington made falsely representations to Plaintiff; namely, that BB&T bank had agreed to the contemplated transaction and that Grantham had a US trader who had agreed to the contemplated transaction.

3.     Neither Grantham nor S.A.L.T. have access to or have made money with a trader and there was no trader with such credit line at BB&T ban or any other bank that agreed to the contemplated transaction.

4.     Given the above, BB&T bank couldn't have agreed to the contemplated transaction in any sense as the material elements of it (i.e. the alleged trader and the line of credit did not exist).

5.     The defendants knew or should have known that at the time they made these statements they were false because no such relationship or line of credit in fact existed and DeLape and Karrington therefore could not have verified such relationship with any bank, bank officer or trader.

6.     The statements were certainly material to the transaction as the trader and credit line were the means of monetizing the UBS Sagittarius 2777817, 2777818 and Capricorn 27778126 certificates.

7.     Plaintiff reasonably and justifiably relied on these statements as he in fact entrusted Grantham with the UBS assets based on the representations and Cope, DeLape and Karrington each verified Grantham's statements. Said individuals had substantial credibility as Cope was the daughter of an esteemed senator, a consultant with the US FDIC and a political lobbyist, DeLape and Karrington have readily verifiable connections to the Bush family and Karrington represented that he had connections to one of the officers at the Federal Reserve (who had been a neighbor of his since his child was in kindergarten and the two regularly discussed business after becoming friends while dropping their children off at the bus stop).

8.     As a direct and proximate result of the Defendants' misrepresentations Plaintiff is entitled to payment for the loss of interest and business opportunity in the amount of $6 million dollars and is entitled to an Order requiring the immediate return of Plaintiff's assets.


        WHEREFORE, Plaintiff Joseph Riad respectfully requests entry of judgment in his favor as to Counts 8 and 9, and against Defendants, Jesse C. Grantham, S.A.L.T., Legendary, John Moran, Pya Cope, Frank DeLape and William Karrington, jointly and severally, for the following relief:
        A.     An Emergency Interim Order placing the Sagittarius Gold Certificate 2777817 and the two Certificates of Deposit in a constructive trust/safekeeping; and, freezing any and all bank accounts of GCW and S.A.L.T.
        B.     Damages, including compensatory, incidental and consequential, simple interest and legal interest, the gold value of the UBS Gold Certificate (if not returned to Plaintiff) and Currency Value of any Certificate of Deposit (if not returned to Plaintiff), treble, restitutionary and punitive damages.
        C.     The return of said assets to Plaintiff, free and clear of all liens and encumbrances.; and, (b) make return of said assets by personally delivering same to Plaintiff at Bank of America, Philadelphia, Pennsylvania, (932 Chestnut St., Philadelphia, PA) at 12:00 noon on the first banking day following the date of the Order.
        D.     Any and all other such relief as this Honorable Court may deem appropriate.

**COUNT 10**
**MISREPRESENTATION**
**(Riad vs. Jesse Grantham, Pya Cope, John Moran, S.A.L.T.)**

1.     The allegations contained in this Complaint, and all related appendixes, are incorporated herein, as if set forth in full.

2.     Grantham represented to Plaintiff that would procure and thereafter, beginning on or about 1/19/15 and continuing until on or about 5/12/15 that he had procured the bank guaranteed SKR with respect to the Sagittarius 2777817 Cert. and the Capricorn 27778126Cert. on or about 1/19/15; and, continued to make such representations to Plaintiff and others as stated in this Complaint until Plaintiff found out the representations were false and confronted Grantham about same on 5/12/15.

3.     Grantham represented to Plaintiff that he would place and thereafter beginning on or about 1/19/15 that he had placed the CDs in safekeeping at BB&T bank until UBS paperwork was completed and they were cashed at 100% face value.

4.     The representations were material because Plaintiff would not have entrusted Grantham with the assets unless they were going to be directly placed in safekeeping with BB&T bank in return for a bank guaranteed SKR; and, Plaintiff would not have entrusted Grantham with same unless the SKR was in furtherance of the monetization contemplated by the referenced documents and contracts through the trader at BB&T bank in Kentucky.

5.     The representations were material because Plaintiff would not have entrusted Grantham with the assets unless they were going to be placed in a safety deposit box at a known bank for a short period of time until the assets were cashed at UBS bank.

6.     Plaintiff reasonably and justifiably relied on these representations when he relinquished possession of the UBS assets to Plaintiff on or about 1/16/15 at the Philadelphia airport for the purpose of placing them on deposit with BB&T bank and in a safety deposit box at BB&T bank as stated in the SKR, referenced contracts and Written Consent.

7.     As a direct and proximate result of the Defendants' misrepresentations Plaintiff is entitled to payment for the loss of interest and business opportunity in the amount of $6 million dollars and is entitled to an Order requiring the immediate return of Plaintiff's assets.

WHEREFORE, Plaintiff Joseph Riad respectfully requests entry of judgment in his favor as to Counts 10, and against Defendants, Jesse C. Grantham, S.A.L.T., John Moran, Pya Cope, jointly and severally, for the following relief:

A.     An Emergency Interim Order placing the Sagittarius Gold Certificate 2777817 and the two Certificates of Deposit in a constructive trust/safekeeping; and, freezing any and all bank accounts of GCW and S.A.L.T.

B.     Damages, including compensatory, incidental and consequential, simple interest and legal interest, the gold value of the UBS Gold Certificate (if not returned to Plaintiff) and Currency Value of any Certificate of Deposit (if not returned to Plaintiff), treble, restitutionary and punitive damages.

C.      The return of said assets to Plaintiff, free and clear of all liens and encumbrances.; and, (b) make return of said assets by personally delivering same to Plaintiff at Bank of America, Philadelphia, Pennsylvania, (932 Chestnut St., Philadelphia, PA) at 12:00 noon on the first banking day following the date of the Order.

D.      Any and all other such relief as this Honorable Court may deem appropriate.

## COUNT 11
## CIVIL CONSPIRACY AS TO COUNTS 6-10
### (Riad vs. Jesse Grantham, S.A.L.T., GCW, John Moran, Pya Cope, Frank DeLape, William Karrington, Legendary and William Windsor)

1.      The allegations contained in this Complaint, and all related appendixes, are incorporated herein, as if set forth in full.

2.      The participants of the civil conspiracy include Defendants, Jesse Grantham, John Moran, S.A.L.T., Pya Cope, William Windsor, GCW, Frank DeLape, William Karrington and Legendary..

3.      The above referenced participants conspired to defraud Plaintiff of his property including the Sagittarius 2777817 Cert and the two gold CDs and the other assets as stated in this Complaint to utilize same for their own personal gain and otherwise to finance and purchase an equity interest in the Mexican Airport Project (described above).

4.      Defendants did in fact defraud Plaintiff of the Sagittarius 2777817 Cert and the two gold CDs on or about January 15, 2015, when Grantham was entrusted with same based on the numerous false representations by the defendants.  Since said time, Grantham and this conspiracy has been monetizing or attempting to monetize these assets for their own personal gain and for the funding of the Mexican Airport Project without Plaintiff's consent and as otherwise stated in this Complaint.

5.      Defendant Jesse Grantham was only able to take possession of the above referenced assets because of the numerous acts and false representations by Defendant Cope, Defendant Moran, Defendant DeLape and Defendant Karrington, that were meant to gain credibility and trust for Defendant Grantham.

6.      Defendants Jesse Grantham, Pya Cope and William Windsor, by and through a shell company they created on May 27, 2015, GCW, monetized or attempted to monetize one or more UBS assets and/or a color copy of one or more of Plaintiff's other assets (the initial assets S.AL..T. was supposed to monetize) along with his authentication reports (provided confidentially in the JVA and the use of which was limited to lawful monetization, in accord with the JVA and for the benefit of Plaintiff) for their own personal gain and to fund the Mexican Airport Project.

7.      As a direct and proximate result of the Defendants' tortious conduct and these defendants conspiracy to commit the above referenced torts, Plaintiff is entitled to payment for the loss of interest and business opportunity in the amount of $6 million dollars and is entitled to an Order requiring the immediate return of Plaintiff's assets.

WHEREFORE, Plaintiff Joseph Riad respectfully requests entry of judgment in his favor and against Defendants, Jesse Grantham, S.A.L.T., GCW, John Moran, Pya Cope, Frank DeLape, William Karrington, Legendary and William Windsor, jointly and severally, for the following relief:

      A.     An Emergency Interim Order placing the Sagittarius Gold Certificate 2777817 and the two Certificates of Deposit in a constructive trust/safekeeping; and, freezing any and all bank accounts of GCW and S.A.L.T.

      B.     Damages, including compensatory, incidental and consequential, simple interest and legal interest, the gold value of the UBS Gold Certificate (if not returned to Plaintiff) and Currency Value of any Certificate of Deposit (if not returned to Plaintiff), treble, restitutionary and punitive damages.

      C.     The return of said assets to Plaintiff, free and clear of all liens and encumbrances.; and, (b) make return of said assets by personally delivering same to Plaintiff at Bank of America, Philadelphia, Pennsylvania, (932 Chestnut St., Philadelphia, PA) at 12:00 noon on the first banking day following the date of the Order.

      D.     Any and all other such relief as this Honorable Court may deem appropriate.

## COUNT 13
## CONDUCT AND PARTICIPATION IN A RICO ENTERPRISE THROUGH A PATTERN OF RACKETEERING ACTIVITY IN VIOLATION OF *18 USC § 1962(c)*.
### (Riad vs. Jesse Grantham, S.A.L.T., GCW, John Moran, Pya Cope, Frank DeLape, Legendary and William Windsor)

1.     The allegations contained in this Complaint, and all related appendixes, are incorporated herein, as if set forth in full.

**CIVIL RICO PERSON.**
2.     Defendants S.A.L.T., GCW, Legendary, Jesse Grantham, John Moran, Pya Cope, William Windsor, Frank DeLape and any unincorporated partnership comprising one or more of these members each are "Persons" as each is capable of holding "a legal or beneficial interest in property." *18 USC § 1961(3)*.

**CIVIL RICO ENTERPRISE**
3.     At various times and places stated in this Complaint, including any appendixes hereto, all Defendants did associate with a RICO enterprise of individuals who were associated in fact and who engaged in, and whose activities did affect foreign and interstate commerce.

4.     The RICO enterprise was an ongoing informal association of the defendants whereby the initial main company, S.A.L.T., was owned and operated by Defendants Grantham and Moran.

5.     Grantham and Moran would utilize Windsor's banking connections and fraudulent project schemes to defraud or attempt to defraud potential investors of cash, assets and other items of value.

6.     Grantham and Moran would utilize Cope, DeLape and Legendary as consultants in many of the transactions; their job as consultants would be to introduce the prospective victims and/or to convince the prospective victims that Grantham, Moran and S.A.L.T. was financially capable entity with substantial banking and political contacts and a proven track record of success in similar business ventures.

42

7.     Moran also used his WF banking connection, in similar fashion when he would lead other prospective victims into believing that S.A.L.T. had substantial financial capacity to enter into contemplated transactions.

8.     These activities did affect both the US domestic commerce as well as foreign commerce.

**CIVIL RICO PATTERN and PREDICATE ACTS**
4.     Likewise, all Defendants did conduct and/or participate, either directly or indirectly, in the conduct of the affairs of said RICO enterprise through a pattern of racketeering activity, all in violation of *18 USC §§ 1961(4), 1962(c)*.

5.     The predicate acts alleged here cluster around numerous counts of mail and wire fraud, and interstate transportation of stolen property during the past ten (10) years.  See 18 U.S.C. §§ 1342, 1343, 2319, 2315, respectively.  The primary objective of the racketeering *enterprise* has been to inflict severe and sustained economic hardship upon "Persons", as the term is defined in the statute, including, without limitation, Plaintiff; with the intent of illegally depriving said Persons, including, without limitation, Plaintiff, of their respective property so as to obtain financial benefit for Defendants.

6.     During the ten (10) calendar years preceding August 14, 2015, all Defendants did cooperate jointly and severally in the commission of two (2) or more of the RICO predicate acts that are itemized in the RICO laws at *18 USC § 1962(c)* (prohibited acts).

7.     Plaintiff further alleges that all Defendants did commit two (2) or more of the offenses itemized above in a manner which they calculated and premediated intentionally to threaten continuity, i.e. a continuing threat of their respective racketeering activities, also in violation of the RICO laws at *18 USC § 1962(c)*.

8.     Plaintiff has standing as I have suffered harm as a direct and proximate result of the RICO enterprise's activities.  In the instant case, Defendants intended to defraud Plaintiff of his property (certain assets, including, 2 Certificates of Deposits and the Sagittarius Gold Certificate, defined below), by use of the mail, wire communications and banking relationships and by the use of copyrighted works concerning Plaintiff's property, so as to procure certain assets of Plaintiffs and utilize or attempt to utilize same to finance and purchase an equity interest in the Mexican Airport Project (described infra); and, in so doing transported the stolen property over numerous states' lines.

**COUNT 14**
**CONSPIRACY TO ENGAGE IN A PATTERN OF RACKETEERING ACTIVITY IN VIOLATION OF *18 USC §§  1962(c), 1962(d)*.**

1.     The allegations contained in this Complaint, and all related appendixes, are incorporated herein, as if set forth in full.

2.     At various times and places stated in this Complaint, including any appendixes hereto, all Defendants did conspire to did conduct and/or participate, either directly or indirectly, in the conduct of the affairs of a RICO enterprise (identified in the above Count) who engaged in, and

43

whose activities did affect foreign and interstate commerce. through a pattern of racketeering activity, all in violation of *18 USC §, 1962(c)*.associate with a RICO enterprise of individuals.

3.      During the ten (10) calendar years preceding August 14, 2015, all Defendants did cooperate jointly and severally in the commission of two (2) or more of the RICO predicate acts that are itemized in the RICO laws at *18 USC § 1962(c)* (prohibited acts).

4.      Plaintiff further alleges that all Defendants did commit two (2) or more of the offenses itemized above in a manner which they calculated and premediated intentionally to threaten continuity, i.e. a continuing threat of their respective racketeering activities, also in violation of the RICO laws at *18 USC § 1962(c)*.

5.      Plaintiff has standing as I have suffered harm as a direct and proximate result of the RICO enterprise's activities.  In the instant case, Defendants intended to defraud Plaintiff of his property (certain assets, including, 2 Certificates of Deposits and the Sagittarius Gold Certificate, defined below), by use of the mail, wire communications and banking relationships and by the use of copyrighted works concerning Plaintiff's property, so as to procure certain assets of Plaintiffs and utilize or attempt to utilize same to finance and purchase an equity interest in the Mexican Airport Project (described infra); and, in so doing transported the stolen property over numerous states' lines.

WHEREFORE, Plaintiff Joseph Riad respectfully requests entry of judgment in his favor and against Defendants, Jesse Grantham, S.A.L.T., GCW, John Moran, Pya Cope, Frank DeLape, Legendary and William Windsor, joint and severally, for the following relief:

A.      An Emergency Interim Order placing the Sagittarius Gold Certificate 2777817 and the two Certificates of Deposit in a constructive trust/safekeeping; and, freezing any and all bank accounts of GCW and S.A.L.T.

B.      Damages, including compensatory, incidental and consequential, simple interest and legal interest, the gold value of the UBS Gold Certificate (if not returned to Plaintiff) and Currency Value of any Certificate of Deposit (if not returned to Plaintiff), treble, restitutionary and punitive damages.

C.      The return of said assets to Plaintiff, free and clear of all liens and encumbrances.; and, (b) make return of said assets by personally delivering same to Plaintiff at Bank of America, Philadelphia, Pennsylvania, (932 Chestnut St., Philadelphia, PA) at 12:00 noon on the first banking day following the date of the Order.

D.      All Defendants be required to pay to Plaintiff his costs of the lawsuit incurred herein including, but not limited to, all necessary research, all non-judical enforcement and all reasonable counsel's fees.

E.      That all Defendants be required to account for all gains, profits and advantages derived from their several acts of racketeering in violation of *18 USC § 1962(c)* and from all other violations under state and/or federal law.

F.      That all Defendants be required to account for all gains, profits and advantages derived from their several acts of racketeering in violation of *18 USC § 1962(d)* and from all other violations under state and/or federal law.

G.      That all damages caused by all Defendants, and all gains, profits and advantages derived by all Defendants, from their several acts of racketeering in violation of *18 USC § 1962(c),(d)* and from all violations of all other applicable laws, be deemed to be held in constructive trust, for the benefit of Plaintiff and my heirs and assigns.

Respectfully submitted,

**Joseph Riad, Plaintiff**
**509 Schoolhouse Road**
**Kennett Square, PA 19348**
**484.748.1878**
**jriad@riadholdings.com**

45

APPENDIX 1







APPENDIX 2

001

TRANSFER OF
THESE UNITS IS
RESTRICTED

*This Certifies That*
JOSEPH E. RIAD

*is the owner of*
SIX HUNDRED

*units of the limited liability company*
RIAD & GRANTHAM HOLDINGS, LLC

# MEMBERSHIP SHARES

LIMITED LIABILITY COMPANY

*established under the laws of*
STATE OF DELAWARE

*Transferable on the books of the limited liability company by the holder hereof in person or by duly authorized attorneys upon proper endorsement and surrender of this certificate and upon consent of the requisite members in accordance with the provisions, terms and conditions of the operating agreements, rules and regulations governing this limited liability company.*

IN WITNESS WHEREOF *this limited liability company has caused this certificate to be executed by the signatures of its duly authorized members and the seal of this limited liability company.*

*Dated this*   26   *day of*   AUGUST   2014 .

SECRETARY                    PRESIDENT

APPENDIX 3

8/24/14 text re Pya set up meeting w/Pres Obama
through her 2 Clinton contacts; 8/26/14 text; 8/27/14
email re MWAPORC/OBAMA

Friday, July 3, 2015      12:21





APPENDIX 4



APPENDIX 5

**SAFEKEEPING RECEIPT**

I, Jesse Grantham, company officer of Riad and Grantham
Holdings, LLC, having a registered address of 886 Sharpless
Road, Hockessin, Delaware, 19707, confirm, with full
responsibility, that I am holding the below instruments in
personal safekeeping for and on behalf of Riad and Grantham
Holdings, LLC pursuant to the Written Consent dated 12 January
2015.

Instruments:

(1)  One (1) of the seven (7) Gold Bullion Certificates,
     covered under a Master Gold Bullion Certificate C.F. Code
     as Virgo 27778128 with incoming custodian receipt No.:
     05040/05114/05113 together with warehouse receipt No.'s:
     C-3120, C-3130, C-3140, C-3150, C-3160 and C-3190, (C-
     3170 and C3180 under separate confirmation), covering
     Gold Bars Bach numbers from A-03423 up to A03471, namely;
     Certificate:  Melba Aganon-C.F. Code SAGITTARIUS-
     27778117 Quantity: as much as Three Thousand, Five
     Hundred (3,500) Metric Tons.

(2)  Two Gold Certificates of Deposit; namely;
     (a)  One (1) Gold Certificate of Deposit, issued January
          11, 1983, Maturity January 11, 2003, issued to Bearer
          by Overseas Investment Limited Bank; NICD No.: 0976-
          041jpd in the amount of One Hundred Million U.S.
          Dollars ($100,000,000.00 USD); and,
     (b)  One (1) Gold Certificate of Deposit, insured by
          Lincoln National Insurance, Company, issued January
          11, 1983, Maturity January 11, 2003, issued to Bearer
          by Bengal Trading Limited, Certificate No.: 0976-
          041jpd in the amount of One Hundred Million U.S.
          Dollars ($100,000,000.00 USD).

I further confirm that I am holding the below instruments for
the purpose of presenting same to the Trader's,
BBT KY         , lending bank; namely,
701 W. Main St, Louisville Kentucky      , for

collateralization of a Line of Credit that shall be issued for the benefit of Riad and Grantham Holdings, LLC.

Finally, I confirm, that in the event one (1) or more of the Assets identified above, are not accepted by the bank, by 30TH January 2015, I shall return same, free of all liens and encumbrances, to the physical and legal possession of Joseph Edward Riad.


BY:   JESSE GRANTHAM

Print Name:  Jesse Grantham
Passport Number: 429909171
Issued Date: 4 September 2007
Expiration Date: 3 September 2017
Dated:  15 January, 2015

APPENDIX 6

**RIAD & GRANTHAM HOLDINGS, LLC**

**WRITTEN CONSENT:**

**MEMBERS' RESOLUTION REGARDING PURCHASE, CUSTODY AND NEGOTIATION OF CERTAIN ASSETS**

**15 January 2015**

**M MEMBERS' RESOLUTION REGARDING PURCHASE, CUSTODY AND NEGOTIATION OF CERTAIN ASSETS**

**WHEREAS**, Riad & Grantham Holdings, LLC, is a limited liability company formed in the State of Delaware with a registered address of 886 Sharpless Road, Hockessin, Delaware, 19707.

**WHEREAS**, Riad & Grantham Holdings, LLC has two members, Joseph Edward Riad ("Riad"), an individual with an address of 161 Chrome Road, Nottingham, Pennsylvania, 19362, and Solutions Acquisitions Logistics Trainings, LLC, ("S.A.L.T."), a limited liability company, formed in the state of Mississippi, with an address of 441 NorthPark Drive, Ridgeland, Mississippi, 39157.

**WHEREAS**, Riad owns sixty percent (60%) of Riad & Grantham Holdings, LLC, and S.A.L.T. owns forty percent (40%) of Riad & Grantham Holdings, LLC.

**WHEREAS**, Riad is the holder and beneficial owner of the below Assets,

(1) One (1) of the seven (7) Gold Bullion Certificates, covered under a Master Gold Bullion Certificate C.F. Code as Virgo 27778128 with incoming custodian receipt No.: 05040/05114/05113 together with warehouse receipt No.'s: C-3120, C-3130, C-3140, C-3150, C-3160 and C-3190, (C-3170 and C3180 under separate confirmation), covering Gold Bars Bach numbers from A-03423 up to A03471, namely;   Certificate: Melba Aganon-C.F. Code SAGITTARIUS- 27778117 Quantity: as much as Three Thousand, Five Hundred (3,500) Metric Tons.

(2) Two Gold Certificates of Deposit; namely;

(a) One (1) Gold Certificate of Deposit, issued January 11, 1983, Maturity January 11, 2003, issued to Bearer by Overseas Investment Limited Bank; NICD No.: 0976-041jpd in the amount of One Hundred Million U.S. Dollars ($100,000,000.00 USD); and,

(b) One (1) Gold Certificate of Deposit, insured by Lincoln National Insurance, Company, issued January 11, 1983, Maturity January 11, 2003, issued to Bearer by Bengal Trading Limited, Certificate No.: 0976-041jpd in the amount of One Hundred Million U.S. Dollars ($100,000,000.00 USD).

**WHEREAS**, it is deemed desirable and in the best interests of this company that the following actions be taken by the Members of this company pursuant to this Written Consent:

**NOW, THEREFORE, BE IT RESOLVED** that the undersigned Members, acting in their capacity as Members of Riad & Grantham Holdings, LLC, hereby consent to, approve and adopt the following:

**1.      Purchase of Assets**

**1.1          RESOLVED THAT,**

Effective as of the date hereof, Riad & Grantham Holdings, LLC, is authorized to execute and shall execute the Purchase and Sale Agreement between Riad, S.A.L.T. and itself, acquiring the above identified Assets.

**1.2          RESOLVED FURTHER THAT,**

Jesse Grantham, officer of Riad and Grantham Holdings, LLC, and representative of S.A.L.T., is authorized to act as safe-keeper and transport the above Assets to the Trader, _____'s, bank (401 W. Main St Lousville, Kentucky_____)wherein said Assets shall be utilized as collateral to secure a Line of Credit in favor and for the benefit of Riad and Grantham Holdings, LLC.

**1.3          RESOLVED FURTHER THAT,**

Jesse Grantham, officer of Riad and Grantham Holdings, LLC, and representative of S.A.L.T., is authorized to negotiate such terms and conditions of the above transactions, in accord with the terms and conditions stated in the Purchase and Sales Agreement referenced above and otherwise discussed and agreed to by Riad.

**1.4          RESOLVED FURTHER THAT,**

Any and all contracts shall be executed by both members of Riad and Grantham Holdings, LLC.

This written consent shall be filed in the Minute Book of this company and become a part of the records of this company.  This written consent may be signed by counterpart and by email.

**DATED:  15 OCTOBER 2015**

**(Signature Page of Members to Follow)**

BY:  JOSEPH RIAD

Print Name: Joseph Riad
Capacity: SHAREHOLDER
Passport Number: 461915602
Issued Date: 26 October 2009
Expiration Date: 25 October 2019
Dated:  15 January, 2015

BY:  SOLUTIONS ACQUISITIONS LOGISTICS & TRAINING

Authorized Representative
Print Name:  Jesse Grantham
Position: CEO
Capacity:  SHAREHOLDER
Passport Number: 429909171
Issued Date: 4 September 2007
Expiration Date: 3 September 2017
Dated:  15 January, 2015

APPENDIX 7

---------- Forwarded message ----------
From: **john moran** <jjjmoran@hotmail.com>
Date: Tue, May 6, 2014 at 2:01 PM
Subject: Fwd: MTN Escrow Procedures / Escrowed Call Option Fee Agreement
To: Amy RH <amyroyh@gmail.com>

Begin forwarded message:

**From:** John Moran <jmoran5@icloud.com>
**Subject: Re: MTN Escrow Procedures / Escrowed Call Option Fee Agreement**
**Date:** May 6, 2014 11:00:47 AM PDT
**To:** Kevin Wynne <wynnekt@aol.com>, Paul Ramirez <prpayitforward@aol.com>

the problem is not SALT's performance-the problem is remitting funds to a source that don't communicate and
this is not acceptable banking policies.
once I comply to replace funds that you were to organize to deliver MTN's with this arrangement, I am technically disqualified from recovery for acting so stupid in my interactions or lack of with Capital Strategies

how much is the option fee for a transaction of $500 Million Euros?

I gave your group the luxury of communication with my top rated banker. Doesn't anyone have confidence once Wells Fargo issues a commitment on my behalf.
Funding movies and boxing events costs countless millions yet no one interested in investing in this project and I find it strange.

On May 6, 2014, at 10:54 AM, Kevin Wynne wrote:

The fee is meant to be a guarantee of SALT's performance and any hesitation
on your part to guarantee your own performance needs further discussion so
we understand.  The only difference between posting the call option fee and
guaranteeing it in the event of SALT's default is timing.

You mentioned on Saturday that you and Jack understand the 9-step procedures
involved and that you and Jack are both capable of funding the call option
fee if fully explained and laid out in writing.  The Escrow Agreement is
less than 3 pages and the purpose of the call option fee clearly spelled
out.  Is there anything else about it that you have questions about?

Lastly, aren't you using cash to purchase the MTN?  I'm not sure where

SALT's creditworthiness comes into play.  If you aren't using cash, then we
need to understand how you intend to execute this transaction.

Thanks,

Kevin


-----Original Message-----
From: John Moran [mailto:jmoran5@icloud.com]
Sent: Tuesday, May 06, 2014 1:37 PM
To: Kevin Wynne; Paul Ramirez
Subject: Re: MTN Escrow Procedures / Escrowed Call Option Fee Agreement

Part 1 is getting the MTN. This is your responsibility. I am not
participating in Part 1 profits.
Also, the clearing house at any time can declare the buyer is not
creditworthy and take the money.
I am asked to have working relationship without verbal dialogue from Capital
Strategies for myself or my banker.


John


On May 6, 2014, at 10:01 AM, Kevin Wynne wrote:


We would prefer you put up the option money for the first transaction.
If that goes through successfully, Amy can most likely get HH to post
the option money on future MTN trades.


Kevin

-----Original Message-----
From: John Moran [mailto:jmoran5@icloud.com]
Sent: Tuesday, May 06, 2014 12:56 PM
To: Kevin Wynne; Paul Ramirez
Subject: Re: MTN Escrow Procedures / Escrowed Call Option Fee
Agreement
Importance: High

Jack and I will be in a private call at 4:30 ECT regarding this matter
and one on the table.
Afterwards, I think a cc would be great, I will review.
I assume that you want me to put up the option money rather than
guarantee your funds replaced were we to default?
Or do you have the option funds available as you were initially pursuing?

John
On May 6, 2014, at 9:52 AM, Kevin Wynne wrote:

John,

Here are the MTN trade procedures to purchase and resell MTNs through
Helping Hands' platform with Capital Strategies.  As I mentioned last
week and as Amy described to Jack, a call option fee must be posted
to block the target instrument for up to 21 days while the Settlement
House/Provider's bank titles the instrument and prepares then submits
the compliance package to your banker.  In addition to blocking the
target instrument, the call option fee guarantees the fees the
Provider pays to block and title the instrument and submit the due
diligence package.  As you will see from the Escrow Agreement, the
call option fee is returned if the buyer closes on the MTN and the
call option fee is forfeited if the buyer does not close on the
purchase
since the Provider's bank would have already incurred those fees.

Let me know if you have any questions.  It would be great after you
and Jack review these documents if we can all jump on a call with
Tina at Helping Hands to review everything.

Thanks,

Kevin

-----Original Message-----
From: John Moran [mailto:jmoran5@icloud.com]
Sent: Monday, May 05, 2014 5:48 PM

To: Kevin Wynne
Subject: option

Kevin,

How are you doing providing the option relationship of Capital
Strategies Group Ltd Geneva Switzerland with our deal.

I have the funds committed to move forward.

Thank you,

John Moran
<Helping Hands Escrow Procedures.pdf><Sample Helping Hands Escrow
Services Agreement.pdf>

---------- Forwarded message ----------
From: **Kevin Wynne** <wynnekt@aol.com>
Date: Sun, Apr 27, 2014 at 10:49 PM
Subject: JV Agreement with SALT
To: Amy RH <amyroyh@gmail.com>, Paul Ramirez <prpayitforward@aol.com>

I've revised the agreement into a JV as discussed this afternoon.  It took a little longer than I expected to conform everything into a JV structure.  You should note a few specific things I added to the agreement since last Friday:

1.    New paragraph 1 which now describes the formation of the JV and specifically defines the business purpose of the JV

2.    I reworked the Option Period in paragraph 2 by saying my company would seek to negotiate a 3-day "first look period" if SALT closes on an MTN transaction within 60 days

3.    Made the rev-share description in paragraph 3 more detailed

4.    In paragraph 6, I included the right to terminate the agreement if the JV doesn't close an MTN transaction within the first 60 days

5.    Beefed up the disclaimers in paragraph 11

We still need to decide what state law governs any disputes under the agreement and to include a list of the first 10 MTNs available for purchase from Helping Hands in Schedule 1.

Let's talk first thing tomorrow after you have thoroughly reviewed this before we send to John.

Thanks,

Kevin

Amy RH <amyroyh@gmail.com>                          Wed, Jul 8, 2015 at 6:32 PM
To: Kala Rector <kalarector422@gmail.com>, Joe <jriad@riadholdings.com>


From: **Paul** <prpayitforward@aol.com>
Date: Fri, Apr 18, 2014 at 1:58 PM
Subject: RE: Oil Escrow
To: Kevin Wynne <wynnekt@aol.com>
Cc: "prpayitforward@aol.com" <prpayitforward@aol.com>


Thank you
_____

**From:** Kevin Wynne
**Sent:** 4/18/2014 12:58 PM
**To:** Paul Ramirez
**Subject:** FW: Oil Escrow

From John Moran.  .  .


-----Original Message-----
From: John Moran [mailto:jmoran5@icloud.com]
Sent: Friday, April 18, 2014 12:30 PM
To: wynnekt@aol.com
Subject: Escrow

Kevin,

It was nice conversing with you.
I would prefer the escrow at Wells Fargo Advisors in New York where my
banker would facilitate confirmations. He is one of the top transactional
bankers in the country.
His clientele list is a Who's Who.

Let me know if this is acceptable,

Thanks,

John
949 338 1983
SALT CFO

Bcl is sent by my banker after funds in escrow
Bank will guarantee safety of funds
Deals for jet fuel, d2 Mazut and oil available
Will share contracts only after funds in escrow
Can purchase fob or in some cases CIF
China reputation very slippery and want to learn all and steal relationships
Oil from Iraq, Libya Venezuela Russia for non American purchase and former Russian satellites
Sent from my iPhone

> On Apr 18, 2014, at 4:24 PM, wynnekt@aol.com wrote:
>
> John,
>
> Can probably do the BCL for the oil transaction but not sure about the MTN deal by next week.
>
> Forgive my questions but this is new to me and my funding sources will ask me some basic questions as a condition of entertaining this. But if satisfied, they can move quickly.
>
> What details on the oil deal can you give me? Source country? Type of product - crude, jet fuel, etc.? Quantity of product? When does the BCL have to be delivered? How many days after the BCL is delivered will the shipment be delivered and the sale closed? You mentioned Exxon - are they buying or selling?
>
> Lastly, can you send me a sample BCL? I just want to see exactly what the investor's bank would have to provide for an oil deal of this magnitude.
>
> Thanks John. Look forward to working together.
>
> Best,
>
> Kevin
>
>
>
> Sent from my Verizon Wireless BlackBerry
>
> -----Original Message-----
> From: John Moran <jmoran5@icloud.com>
> Date: Fri, 18 Apr 2014 14:19:08 -
> To: Kevin Wynne<wynnekt@aol.com>
> Subject: Re: Escrow
>
> I am moving Deutsche bank MTN transaction next week,
>
> I checked on you before sending info... Very impressive.
>
> Exxon will be the second BCL.
>
> Later,
> John
>> On Apr 18, 2014, at 2:17 PM, Kevin Wynne wrote:
>>

**From:** wynnekt@aol.com
**Sent:** 4/19/2014 8:04 AM
**To:** Paul Ramirez
**Subject:** Fw: Escrow

Paul,

I'll be taking off in a bit for Indianapolis and I'm not sure how much time I'll have to do other things so I'm sending this email with the points I need clarified and my reasons why.

Below is the email I received from John late last night answering some of my questions. I guess him saying 50-50 refers to our split with him on commissions? But I need to know how much the commission will be. I can't ask someone to post a BCL without telling them specifically what they'll get (what amount are we splitting 50-50 so we can decide what to offer the investor). And how soon they will get their share.

Also the fact that Exxon is the seller is a good thing. Doesn't get any more reputable than that. But I'm confused because John originally asked for a $500M BCL and in his email below he says it's a $50M transaction. How much needs to be represented in the BCL for this particular deal?

And is John representing the seller (Exxon) selling to us and we're locating a resale buyer ourselves or are we partnering with John to buy from Exxon (him delivering the oil and us delivering the BCL) and then splitting the commission on the resale?

Lastly, until we do a couple of these, investors are going to ask who are we selling to and how long it will take to close. I can't say "trust me we work with the top oil traders in the world". And any US investor is going to be concerned about possibly selling to any embargoed countries. Are buyers already waiting on this shipment or are we posting the BCL to take control of the oil and then seeking a buyer?

Any clarity on these points will help me get a BCL done quickly. And a $50M BCL will be much easier than a $500M BCL. Also a sample BCL would be very helpful so I can show the investor exactly what their bank has to represent in writing and demonstrate that there is no contingency or term that obligates them to pay anything.


Thanks Paul! I'll try to check in with you if I have any time to make a call.

Kevin


Sent from my Verizon Wireless BlackBerry

-----Original Message-----
**From:** John Moran <jmoran5@icloud.com>
**Date:** Fri, 18 Apr 2014 16:51:28
**To:** wynnekt@aol.com<wynnekt@aol.com>
**Subject:** Re: Escrow

I am on my iPhone
Split 50-50
Exxon sells us fuel, requires $50 million on account
I have the MTN's deal sold yet could offer some amount

>> That's great John!  And I greatly appreciate you sharing the Wells Fargo
>> banker you'd like to use for escrow.
>>
>> I've attached my bio and as I mentioned, I've been involved in sports and
>> entertainment for over 20 years.  I've developed strong relationships
>> working with many star athletes and producing numerous high profile events
>> and I've teamed up with Paul, a close friend for over 10 years, to help
>> facilitate oil and MTN transactions as well as pursuing other business.
>>
>> I look forward to meeting you on your next trip to DC.
>>
>> Best,
>>
>> Kevin
>>
>>
>> ----Original Message----
>> From: John Moran [mailto:jmoran5@icloud.com]
>> Sent: Friday, April 18, 2014 4:35 PM
>> To: Kevin Wynne
>> Subject: Re: Escrow
>>
>> Good News! We have received our Aramco number today. This will be one of the
>> confirmations necessary done by our banker. I will confidentially reveal the
>> banker at Wells next On Apr 18, 2014, at 11:06 AM, Kevin Wynne wrote:
>>
>>> Hi John,
>>>
>>> A pleasure speaking with you as well.
>>>
>>> We're open to using Wells Fargo for escrow subject to investor approval.
>>> Not sure if the money may have a preference but if not, we're open to
>>> whatever facilitates these transactions as smoothly and efficiently as
>>> possible with everyone being protected.
>>>
>>> Look forward to receiving further information.
>>>
>>> Best,
>>>
>>> Kevin
>>> 917-796-1198
>>>
>>> ----Original Message----
>>> From: John Moran [mailto:jmoran5@icloud.com]
>>> Sent: Friday, April 18, 2014 12:30 PM
>>> To: wynnekt@aol.com
>>> Subject: Escrow
>>>
>>> Kevin,
>>>
>>> It was nice conversing with you.
>>> I would prefer the escrow at Wells Fargo Advisors in New York where my

>>> banker would facilitate confirmations. He is one of the top
>>> transactional bankers in the country.
>>> His clientele list is a Who's Who.
>>>
>>> Let me know if this is acceptable,
>>>
>>> Thanks,
>>>
>>> John
>>> 949 338 1983
>>> SALT CFO
>> <KevinWynne - Short Bio.pdf>

APPENDIX 8

IN THE CHANCERY COURT OF JONES COUNTY, MISSISSIPPI
FIRST JUDICIAL DISTRICT

JESSE GRANTHAM                                                PLAINTIFF

VERSUS                                              CAUSE NO. 2013-0008-E

AMANDA HODGE                                                DEFENDANT

## FINAL JUDGMENT OF DIVORCE

THIS DAY this cause came on to be heard on the Complaint for Divorce as filed by

Plaintiff JESSE GRANTHAM against Defendant AMANDA HODGE, and on Defendant's

Countercomplaint, and the Court after being fully advised in the premises, does find as follows:

I.

Both parties were adult resident citizens of Jones County, Mississippi, and resided within

the State of Mississippi for more than six (6) months, prior to the filing of the Complaint for

Divorce; that this Court has jurisdiction of the parties hereto and the subject matter hereof.

II.

That for statistical requirements, both parties are members of the Caucasian race.

III.

That the parties were married on January 9, 2010, in Lake Village, Arkansas. The parties

resided together most recently at the marital residence in Jones County, Mississippi, until the

parties separated on or about January 11, 2013. The parties have not resumed cohabitation since

that date.

IV.

One child has been born to the parties, namely Charlotte Nadine Grantham, born May 6,

2009. Plaintiff AMANDA HODGE is not now pregnant.

V.

That since the January 11, 2013, date of separation, the parties have lived continuously separate and apart from each other without cohabitation.

VI.

That the parties are entitled to a divorce based upon adultery and there is no reasonable prospect of reconciliation of this marriage.

VII.

That the parties have one minor child together, Charlotte Nadine Grantham, born May 6, 2009. The parties have agreed to enter into this Property Settlement, agreeing and consenting to a fault divorce for adultery, and request the Honorable Court to grant the parties a divorce and determination of custody, visitation, and property settlement as described herein upon receiving this filing and on the first available docket date available.

VIII.

There are no custody, child support, visitation rights, or property rights to be adjudicated between the parties. The parties have agreed to all custody, property, asset and debt issues in the Child Custody, Child Support And Property Settlement Agreement. The Child Custody, Child Support And Property Settlement Agreement is attached as Exhibit "A".

IX.

Based upon the foregoing, the court concludes as a matter of law that the parties are entitled to a Judgment of absolute divorce from each other on the grounds of adultery.

IT IS, THEREFORE, ORDERED AND ADJUDGED that JESSE GRANTHAM and AMANDA HODGE be, and they hereby are, awarded a divorce one from the other on the ground of adultery and the bonds of matrimony heretofore existing between them are hereby

AH

wholly dissolved and they are hereby restored to all of the rights and privileges of single persons.

IT IS FURTHER ORDERED AND ADJUDGED that the Child Custody, Child Support And Property Settlement Agreement entered into on the _____ day of November, 2014, should be, and hereby is, approved and ratified.

SO ORDERED AND ADJUDGED on this the _____ day of November, 2014.

_____
CHANCELLOR

AGREED:

_____
Kimberly Johnson
Attorney for Plaintiff

_____
Jesse Grantham
Plaintiff

_____
Carol Ann Bustin
Attorney for Defendant

_____
Amanda Hodge
Defendant

IN THE CHANCERY COURT OF JONES COUNTY, MISSISSIPPI
FIRST JUDICIAL DISTRICT

JESSE GRANTHAM                                                                      PLAINTIFF

VERSUS                                                                      CAUSE NO. 2013-0008-E

AMANDA HODGE                                                                      DEFENDANT



## CHILD CUSTODY, CHILD SUPPORT, AND PROPERTY SETTLEMENT AGREEMENT

The parties, JESSE GRANTHAM and AMANDA HODGE, enter into this agreement for child custody, child support and division of property under the following terms and conditions:

I.

### Vehicles

The parties agree that they shall each retain sole use and possession of any vehicle in their separate name and shall be responsible for all expenses associated with any such vehicle including but not limited to the following: car notes (if any), maintenance, license tag, and insurance.

The parties acknowledge that they do not jointly own any vehicle.

II.

### Marital Residence/Real Property

The parties state that the marital residence prior to separation was a residence located at 1008 E. Magnolia Street, Ellisville, Jones County, Mississippi. The parties acknowledge that said residence was foreclosed. The parties acknowledge that both parties now live with family and/or friends and that neither shall be responsible for any expense such as monthly rent or

A H  11/24/14

utilities of the other.  The parties acknowledge that neither party has any right to enter, possess or inhabit the residence of the other.

## III.

### Personal Property Assets

The parties state that they shall each have sole use and possession of their personal property consisting of personal clothing, toiletries, and other personal items, not specifically set out in this agreement, that each party is in possession of that property, and that the terms set out herein are in the best interest of the parties.  Additionally, the parties state that they shall each return any personal item, such as personal clothing and other personal items, belonging to the other; specifically JESSE GRANTHAM shall return all of her diaries and journals to AMANDA HODGE.

## IV.

### Financial Assets

The parties state that they do not have any joint financial account, such as checking or savings or otherwise.

The parties agree that AMANDA HODGE shall have sole use and possession of any individual account or asset in her name, and JESSE GRANTHAM shall have sole use and possession of any individual account or asset in his name.

## V.

### Liabilities

The parties acknowledge that they have not incurred any joint indebtedness and that any joint indebtedness shall be equally divided between them.

AH  11/21/14

The parties agree that JESSE GRANTHAM shall be responsible for all unnamed indebtedness, including credit cards and school loans, incurred by him individually and that he shall indemnity and hold harmless AMANDA HODGE from said indebtedness.

The parties agree that AMANDA HODGE shall be responsible for all unnamed indebtedness, including credit cards and school loans, incurred by her individually and that she shall indemnity and hold harmless JESSE GRANTHAM from said indebtedness.

VI.

**Alimony**

Both parties waive any claims for alimony, either lump sum or periodic, permanent or rehabilitative, as against the other.

VII.

**Custody**

The parties agree that they shall have joint legal and physical custody of the minor child of the parties, Charlotte Nadine Grantham, born May 6, 2009, and that AMANDA HODGE shall exercise primary physical care and custody of the minor child of the parties having custody during the school year and that JESSE GRANTHAM shall be entitled to exercise custody of the minor child from the day following the time the child is released from school for summer vacation until the day before the first day of school.

VIII.

**Custody Schedule**

The parties agree that AMANDA HODGE shall exercise primary physical care and custody of the minor child of the parties having custody during the school year and that JESSE GRANTHAM shall be entitled to exercise custody of the minor child from the day following the

AH 11/2-VIU

As to transportation associated with exchange of custody, should JESSE GRANTHAM wish to exercise his weekend visitation, all exchange of the minor child shall take place at the Seneca (SC) Police Department. Should AMANDA HODGE wish to exercise her weekend visitation, all exchange of the minor child shall take place at the Laurel (MS) Police Department. For all other, i.e. holiday and summer, custody, exchange of the minor child shall take place as follows: JESSE GRANTHAM shall pick up the minor child at the Seneca (SC) Police Department at the beginning of his period of custody, and AMANDA HODGE shall pick up the minor child at the Laurel (MS) Police Department at the end of JESSE GRANTHAM's period of custody.

## IX.

### Child Support

JESSE GRANTHAM shall pay $375.00 per month to AMANDA HODGE as child support/maintenance of the minor child of the parties, beginning December 1, 2014, for every month wherein the minor child is in the physical care and custody of AMANDA HODGE for the majority of the month. The parties agree that AMANDA HODGE shall pay $375.00 per month to JESSE GRANTHAM as child support/maintenance of the minor child of the parties for every month wherein the minor child is in the physical care and custody of JESSE GRANTHAM for the majority of the month.

## X.

### Health Insurance

The parties agree that AMANDA HODGE shall provide health insurance for the minor child; the parties agree that they shall be responsible for any costs associated with providing health insurance for the child and that AMANDA HODGE shall provide proof of said cost to

AH  11/26/14

WITNESS our signatures on this the _____ day of November, 2014.

Respectfully submitted,

_____
JESSE GRANTHAM

_____
AMANDA HODGE

APPROVED:

_____
KIMBERLY JOHNSON
*Attorney for Jesse Grantham*

_____
CAROL ANN ESTES BUSTIN
*Attorney for Amanda Hodge*

STATE OF _South Carolina_

COUNTY OF _Anderson_

Personally appeared before me, the undersigned legal authority in and for the jurisdiction aforesaid, the within named AMANDA HODGE, who acknowledged that she signed, executed and delivered the above and foregoing Child Custody, Child Support and Property Settlement Agreement on the day and year therein mentioned as her free and voluntary act and deed.

Given under my hand and official seal of office on this the _24th_ day of November, 2014.

_____
Notary Public

My commission expires:                                     (Affix seal)
_Oct  14  2020_

ZACHARY C GUNNELS
Notary Public
State of South Carolina
Commission Expires Oct. 14, 2020

STATE OF MISSISSIPPI
COUNTY OF JONES

Personally appeared before me, the undersigned legal authority in and for the jurisdiction aforesaid, the within named JESSE GRANTHAM, who acknowledged that he signed, executed and delivered the above and foregoing Child Custody, Child Support and Property Settlement Agreement on the day and year therein mentioned as his free and voluntary act and deed.

Given under my hand and official seal of office on this the 10th day of November, 2014.

Concetta Brooks, Chancery Clerk

_____ D.C.
Notary Public

My commission expires:
My Commission Expire.
Jan. 10, 2016

